NEW YORK COUNTY.—HON. D. G. ROLLINS, SURROGATE.—
April, 1882.

## WETMORE v. CARRYL.

*In the matter of the record of the will of* APOLLUS R.
WETMORE, *deceased.*

Unattested and unexplained alterations, appearing upon the face of a will, are presumed to have been made after execution. *It seems,* that the same rule prevails in this State,—differing from the English doctrine,—in respect to material changes *in a deed.*

The testator, by his will, gave a pecuniary legacy to each of two granddaughters, E. and A., the amount of which, as originally written, was $5,000, but had been changed by erasures, and by marks in ink of a different color from that of the body of the will, to $2,000. The will occupied only a single page of a printed form, at the center of which was a circular blot, three-eighths of an inch in diameter, apparently of the same ink as the alterations. The attention of neither of the subscribing witnesses was called to any alteration, by the testator; neither of them observed any defacement, erasure or other alteration, at the time of the execution; and there was no memorandum to the effect that the changes were made before signature. No direct evidence was given of the execution of the instrument in its altered state. C., one of the executors, testator's son-in-law, testified that, in a conversation with testator, some time in 1880, the latter spoke of having seen his lawyer, F., with reference to drawing up a new will, and stated that F. had suggested $5,000, as the amount of a legacy to each of the granddaughters, to which testator had assented; that witness suggested one-twentieth of the estate as a suitable amount to each of them, to which testator assented; that, the next day, testator said, "I have arranged that in a different way; I have made it $2,000." But the date of these conversations was not fixed relatively to the time of the execution, or even of the drawing of the will; and witness did not understand that they indicated more than a change of purpose. Testator had been a man of proved business capacity, exhibiting skill and precision in the management of affairs, but died aged eighty-four years. The will had been admitted to probate in 1881, and recorded as altered. On an application to change the record, by substituting the original for the altered form,—

*Held,* that to say that testator's declared purpose took shape in the alterations in question, before execution of his will, would be to hazard a guess rather than to draw an inference; that, upon the evidence, the altera-

tions must be deemed to have been made. after such execution; and that the application should be granted.

PETITION by Alethea R. Wetmore, a legatee, to rectify the record of the will of decedent, which was admitted to probate February 16, 1881 ; opposed by Charles E. Carryl and George C. Wetmore, executors. Further facts appear sufficiently in the opinion.

JOHN M. MITCHELL, *for petitioner.*

E. L. FANCHER, *for executors.*

THE SURROGATE.—The testator, by the first clause of his will, gave a legacy to each of two granddaughters, Edith and Alethea. The amount of that legacy, as the same now appears on the face of the instrument, is $2,000. It is discovered, however, upon inspection, and is indeed an admitted fact, that, by the will as it was originally written, the bequest was fixed at $5,000, instead of at $2,000. According to the uncontradicted testimony of Mr. George C. Wetmore, this change, which will presently be described in detail, was made by the decedent himself, and in his own handwriting. The question whether such change was made before or after execution is the one at issue in this proceeding. If before, the will must stand as it now reads, and as it has been recorded, with a legacy to each of the grandchildren of $2,000. If after, the record must be amended, and the bequest to the grandchildren be declared to be $5,000, as the same was originally fixed.

The will in question is on a printed form, and is very brief, occupying but a single page of paper. With the few exceptions hereafter noted, it is written in a very

bright, distinct violet ink, which strikingly contrasts
with the black ink used in making the alteration. The
word "five," about an inch and a half from the top, has
been changed to "two" by erasing the "F" and sub-
stituting a "t," and by writing an "o" over the "e."
The letters "i" and "v" have been in no way disturbed,
except that a faint and partly erased mark is to be seen,
where, probably, the dot of the "i" originally appeared.
The "i" and "v," in "five," when taken together, make
the "w" in "two." Following the word "two" are
the words "thousand dollars each." Over the word
"thousand" is a small cross.  A similar cross appears,
in line with it, in the margin, and directly under that are
the figures 2000, followed by a dollar sign.  Nearly in the
center of the page is a circular blot about three-eighths
of an inch in diameter. This, too, is in black ink.  So are
the words "twenty-eighth," which appear in the date,
and so is the signature of the testator.  No evidence is
before the court, tending to show whether the alteration,
the figures, the blot, the date and the signature were or
were not made with the same ink.  By my own inspec-
tion of the document, I am led to believe that the ink of
the blot is probably the same as that of the alteration
and the marginal figures, and probably different from
that of the date and signature.  This is a circumstance of
some consequence, though not of vital importance, in de-
termining the question at issue.  The alteration is unat-
tested—no memorandum concerning it appears upon the
face of the paper. The attention of neither of the sub-
scribing witnesses was called to it by the testator, and
neither of them observed any erasure, alteration, inter-

lineation or defacement in the instrument at the time it was executed.

Now what, if any, presumption arises from this state of facts, as to the time when the alteration in dispute was made? It is a well-known doctrine of the English law that, so far as relates to deeds, changes, even though material and important, are presumed to have been made before execution. This presumption seems to have originally asserted itself as a sort of corollary to the presumption of innocence. Almost any willful material alteration in a deed, after its execution, would constitute a criminal offense, unless unexplained. Alterations, therefore, were regarded as having been made before execution. Their very existence would create a presumption that some person had committed a crime. The only logical mode of escape from a situation deemed repugnant to the law was found in setting up a presumption, that unexplained alterations must have preceded execution.

The courts of this State, however, have not followed the English doctrine in respect to material changes in a deed, but hold that the party claiming under it must explain the alterations (Herrick v. Malin, 22 *Wend.*, 388 ; Smith v. McGowan, 3 *Barb.*, 404 ; Acker v. Ledyard, 8 *Id.*, 514).

As to wills, the uniform decisions of the English courts, since the passage of the Victoria statute (1 *Vict.*, § 21, ch. 26), have been to the effect that all unattested alterations are presumed to have been made after execution. The leading case is that of Cooper v. Bockett, decided by the privy council in 1844 (4 *Moore's P. C. C.*, 419). The question before that tribunal was whether the will should be admitted to probate, with or without cer-

tain changes apparent on its face.   Lord BROUGHAM pronounced the opinion.   He said that there were two questions : " First.  At what time were the alterations made ?  Were they made before or after the attestation ?   Secondly.  If that point cannot be ascertained, is the instrument to be read as it originally stood, or are the alterations to be admitted as a parcel of it ?"   Reviewing the testimony of the subscribing witnesses (which, it may be said, in passing, was similar to that given in the present case), Lord BROUGHAM said : " Can anything be more clear than that we ought to know whether the testator executed, and the witnesses subscribed, this will as it now exists, or a former will ; for that is the precise question before us.  .  .  .   Whoever propounds an instrument which, on the very face of it, exhibits grounds of great doubt, must remove those grounds and clear up the doubts."   Probate was granted to the instrument in question, as it originally read, before the alterations.  This decision was followed in 1848, in the case of Lushington v. Onslow (6 *Notes of Cases*, 183).

In 1851, the question came before the court of queen's bench, in the case of Doe *dem.* Shallcross v. Palmer (15 *Jur.*, 837).   Lord CAMPBELL pronounced the opinion of the court, declaring that certain unattested alterations in a holograph will must be presumed to have been made after its execution.   He expressed his approval of the decision in Cooper v. Bockett, *supra*, and commented upon the dangerous facility which would be given to a testator, unless that doctrine were upheld, to alter his will after execution.   Greville v. Tylee (7 *Moore P. C. C.*, 320) was decided in 1851, by the privy council, on an appeal from the prerogative court of Canterbury.   In that

case, as in the present, there was an erasure apparent on the face of the will, and over that erasure new matter had been written. Says Dr. LUSHINGTON, the member of the council who pronounced its opinion : " We apprehend it to be now settled that whoever alleges such an alteration to have been done before the execution of the will is bound to take upon himself the *onus probandi.*"

In a case which was before the court of probate in 1858 (In the goods of Elizabeth Stone James, 1 *Swab. & Trist.,* 238) the question arose, as to the effect of erasures so complete as to baffle all efforts for ascertaining the obliterated words. In the judgment of the court, the presumption was that the erasures had been made subsequent to execution, and it was decreed that, so far as related to the parts erased, probate should be had in blank. Two years later, the same will was before the vice-chancellor, in the case of Williams *v.* Ashton (1 *Johns. & H.,* 115). It appeared that, over the erasures, certain provisions had been written in the handwriting of the testatrix. By the evidence of the attesting witnesses, it also appeared that the testatrix told them, at the time of the execution, that she had made some alterations in her will. The will was so folded, however, that they did not see what the alterations were. The vice-chancellor mildly criticises that form of stating the rule of law which the courts had sanctioned. He thinks it inaccurate to say that alterations in a will must be presumed to have been made at one time or at another. It is more correct, in his view, to state that the onus is cast upon the party who seeks to derive an advantage from an alteration in a will, to adduce some evidence from which a jury might infer that the alteration was made before

the will was executed. He adds that the rule of law as to deeds has no application to wills. "There is no crime," he says, "in a testator choosing to make alterations in his own will, but he cannot reserve to himself a power of making future testamentary gifts by unattested instruments. . . . I apprehend the rule is that those who propound a doubtful instrument must make the doubt clear." (See, also, Gann *v.* Gregory, 22 *L. J.*, *Equity*, 1059 ; Simmons *v.* Rudall, 1 *Simons, N. S.*, 115 ; In the Goods of White, 30 *L. J.* [*N. S.*], 55, *P. M. & A.*).

It is claimed by counsel for the executors that recent English decisions upon this question are not precisely in point, as they are founded upon a statute which essentially differs from our own, and that, before the enactment of that statute, a different rule obtained in England. It is true that some early decisions are reported, which are seemingly inconsistent with the doctrine of Cooper *v.* Bockett, *supra*. But, upon careful examination, this inconsistency is found to be more apparent than real. These decisions, so far as I have been able to discover, relate exclusively to wills of personal property ; now, prior to the 1st Victoria statute, no special formalities of execution were essential to the validity of such a will. Any holographic paper, for example, though unsigned and unattested, was allowed the force and effect of a will, if it disclosed a testamentary intention on the part of the decedent. Such being the case, alterations in a will of personal estate might be made by a testator at his pleasure, without affecting its validity. The only question for the determination of the court was the question whether such alterations were testamentary, or only

deliberative in their character. For this purpose, an
inquiry as to the time when such alterations were made,
and ·as to the attendant circumstances, was manifestly
desirable, and indeed essential. It might thus be ascer-
tained whether they were made by the testator himself,
and whether they evinced a testamentary purpose on his
part, or were only intended as memoranda for future
consideration. If, in executing a will as to personalty,
he had chosen to adopt some such formalities as the law
made essential in devises of real property, then, of
course, the appearance of any alteration, on the face of
the instrument, necessitated an inquiry whether or not
it was present there at the time the instrument was exe-
cuted. But, unless the change affirmatively appeared,
under all the circumstances, to have been made after
execution, the courts were naturally very much dis-
posed to hold that it had been made before, prompted as
they were by a desire to give effect to a testator's last
expressed wishes, which were not then required to be
authenticated in any particular form.

The Wills act of 1st Victoria, however, provided that
the same formalities should be required in the execution
of wills of personal as in those of real estate, and de-
clared (1 *Vict.*, § 21, ch. 26) "that no obliteration,
interlineation, or other alteration made in any will after
the execution thereof shall be valid or have any effect
(except so far as the words or effect of the will before
such alteration shall not be apparent), unless such altera-
tion shall be executed in like manner as hereinbefore is
required for the execution of the will; but the will, with
such alteration as part thereof, shall be deemed to be.
duly executed, if the signature of the testator and the

subscription of the witnesses be made in the margin, or on some other part of the will opposite or near to such alteration, or at the foot or end of, or opposite to, a memorandum referring to such alteration, and written at the end or some other part of the will."

It will be observed that the above quoted provision which requires a special memorandum of alterations, relates only to such alterations as are made after execution. The statute is silent as respects prior alterations, and, so far as they are concerned, no memorandum or special attestation is made necessary. It would seem, therefore, that the terms of this statute do not differ so widely from our own, as to make inapplicable to the present case the English decisions to which reference has been made. These decisions have been fully reviewed, because of the singular infrequency with which the question here at issue has been discussed in our American courts.

The case of Van Buren *v.* Cockburn (14 *Barb.*, 118), involved the validity of a holographic will. The trial judge had declined to charge that certain alterations should be presumed to have been made before execution. In this he was sustained by the general term of the supreme court, and also in his statement to the jury that "although ordinarily, when all the requisites of the statutes had been complied with in the execution of the will, the presumption of law is that the instrument produced is the will thus executed, yet when it is made to appear that the will has been altered or changed, the presumption that it is the same paper which was executed disappears (see also McPherson *v.* Clark, 3 *Bradf.*, 93 ; Estate of Prescott, 4 *Redf.*, 178 ; *In re* Tonnele, 5 *N. Y. Leg. Obs.*, 254).

Upon the authorities that have been cited, and the arguments by which they are supported, I should feel bound to hold, in the absence of any evidence other than that to which reference has thus far been made, that this will ought to be recorded as it was originally written.

The legal effect of the evidence, not yet alluded to, is rather to strengthen than to weaken the conclusion that the execution preceded the alteration. I have already intimated that the blot is apparently in the same ink as the alteration. Its position on the page suggests the probability that it was made at the same time. Mr. Carpenter, one of the subscribing witnesses, states that when he wrote his name on the paper no blot was seen by him, and he declares his very positive belief that, if such blot had been then upon the page, he would have observed it; that his experience in connection with the preparation of formal papers was such, that no mark so conspicuous would probably have escaped his attention. Mr. Stevens, the other subscribing witness, gives substantially the same testimony. Both of them swear, also, that they did not perceive any marks of alteration on the face of the will, though it was spread out upon the table before them, and though no part of its very brief contents was hidden from their view.

Mr. Carpenter, who testifies cautiously, says that his inspection of the paper was not sufficiently particular to justify him in swearing that the alterations might not have been already made, but the testimony of his fellow-witness, in that regard, is much more positive. There is no evidence, on the other hand, which directly tends to prove that the instrument was executed in its altered state.

The only evidence bearing indirectly upon that matter is the statement of Mr. Carryl, the son-in-law of the decedent, and one of his executors. He says that, on the evening of some day, in 1880, late in the spring or early in the summer, in the month of May as he believes, he had a conversation with the testator, who told him that "he had seen Judge Fancher with reference to drawing up a new will," that the judge had suggested his giving to Edith and Alethea $5,000 each, and that he had consented to do so. Mr. Carryl said that he thereupon suggested to the decedent the propriety of giving to each of these ladies one-twentieth of his estate, for reasons which were specified, and that the decedent assented to that suggestion, and asked him to draw a will which should be consonant with that scheme. Mr. Carryl declined to do so. The next morning, Mr. Wetmore said to him : " I have arranged that in a different way ; I have made it $2,000." The two then had some conversation in reference to the persons who would be most desirable witnesses to such will as Mr. Wetmore might wish to execute. Mr. Carryl advised that the witnesses should be procured at the Juvenile Asylum, of which institution Mr. Wetmore was president.

This is the substance of Mr. Carryl's testimony, as to which it may be remarked: 1. It does not show, and indeed no other evidence shows or tends to show, whether, at the time of these conversations between Mr. Wetmore and himself, any person had touched pen to paper in the preparation of this will. Mr. Carryl never saw this instrument, executed or unexecuted, until after the testator's death. Mr. Wetmore did not tell him that it had been drafted, or make any statement which would

seem to have involved the fact that the paper had then come into existence. In his own words, Mr. Carryl "did not know that any will had been drawn at all." Mr. Wetmore simply told him that "he had seen Judge Fancher with reference to drawing up a new will." The evidence leaves us utterly in the dark, as to the time when the will now under discussion was prepared and put into the hands of the testator.

2. Mr. Carryl is unable to fix the date of these conversations, either absolutely or with relation to the day when this instrument purports to have been executed. It does not appear, from his testimony, or from any other evidence, whether Mr. Wetmore's visit to the Juvenile Asylum, and the attestation of this will, preceded or succeeded those conversations.

3. Mr. Carryl distinctly testifies that Mr. Wetmore's statement—"I have arranged that in a different way ; I have made it $2,000"—did not convey to him, at the time, the idea that Mr. Wetmore had made a physical alteration on the face of a written paper. On the contrary, he interpreted the remark as a mere declaration of a change of purpose on Mr. Wetmore's part. There is not enough force in this testimony to overcome that of Carpenter and Stevens, especially when we consider the support which the latter receives, as we have already discovered, from legal presumption. There seemed to me, at first, to be some force in the suggestion that, from the proved business capacity of Mr. Wetmore, it might be fairly inferred that he knew the requirements of law in relation to wills, and would not have been likely to alter this paper after it had been formally attested by the witnesses. But there are incidents connected with the ex-

ecution of this instrument which seriously impair the force of this suggestion.

1. It has been incidentally disclosed in this proceeding that neither of the subscribing witnesses saw the testator sign, or heard him acknowledge his signature.

2. The attention of the witnesses was not called by the testator to the alterations, nor is there any memorandum to the effect that such alterations were made before signature.

3. The fashion of the alteration itself—indeed, the very fact of the alteration—shows that no inference can be safely drawn from the supposed business precision and caution of the testator. It would be strange, indeed, if he had possessed, at the advanced age of eighty-four, the same skill and accuracy in the management of affairs which he had formerly exhibited. The argument, therefore, against the antecedent probability of his making these alterations in an executed instrument, does not seem to me very forcible. To my mind, it would antecedently have seemed quite as unlikely that, after making these conspicuous and important changes on the face of an instrument, so brief that he might have caused it to be neatly copied in ten minutes, he should yet have executed it in its defaced condition, and thus almost inevitably have laid the foundation for this controversy. I think that, at some time before he died, Mr. Wetmore made, with his own hands, the alterations in this instrument; but that he did it before execution, I am not persuaded by the evidence. His testamentary designs, as respected his grandchildren, are shown by Mr. Carryl to have been vague and inconsistent. Within the space of a few hours, he announced his intention to give them at first

$5,000 each, then one-twentieth of his estate, then $2,000 each. This last purpose seems to have found expression in the alteration; but to say that his purpose took that shape, before Carpenter and Stevens witnessed the will, is to hazard a guess rather than to draw an inference.

The motion to change the record herein is granted, as prayed for in the petition.

Ordered accordingly.