## *In re* Carver's Will.

### (3 Misc. 567.)

*(Surrogate's Court, Cattaraugus County, Filed May 10, 1893.)*

1. WILLS—PRESUMPTIONS AS TO ALTERATIONS.

   Where alterations appear on the face of a testamentary disposition of property, such alterations are presumed to have been made after execution, rendering it necessary for those seeking to establish a will containing such apparent defects to overcome such presumption by proof, direct or inferential. This is an exception to the general rule as to other instruments, which provides that such alterations, in the absence of proof to the contrary, are presumed to have been made before the execution of the writing in which they appear.

2. SAME—EFFECT OF ALTERATIONS.

   Although as a general rule a material alteration in written documents, made after execution, for fraudulent purposes, vitiates the entire instrument, the effect of an unauthorized and unauthenticated alteration in a will, made after execution, is to render the change inoperative, leaving the will to stand in form and effect as before such alteration was attempted.

3. SAME—ALTERATIONS—WHEN MADE BEFORE EXECUTION.

   A testator bequeathed to his wife $400 annually out of his personal estate, also all his household furniture, goods, books, pictures, organ, clothing, etc., to be accepted in lieu of dower. It was claimed that the words "to be accepted in lieu of dower" were fraudulently inserted after execution. *Held,* that as the words "clothing, etc., to be accepted in lieu of dower" were written upon and constituted one entire line in regular order, and were not crowded, and the only person to be prejudiced by such words, viz., the widow, urged probate of the will as it stood, and the family physician, who had witnessed the will, and carefully examined it at the time of execution, testified he observed no alteration therein, the words in question were not inserted after execution, although the letters in such words were somewhat heavier and of a darker shade than most of the other parts of the will, but not of particular portions thereof.

4. WILLS—TESTAMENTARY CAPACITY.

   When both witnesses to a will, one the family physician of many years standing, and the other an old neighbor and intimate acquaintance of decedent, who nursed him in his last illness. testify that dece-

dent was of sound mind at the time he made his will, and the circumstances attending the execution of the will confirm such conclusions, *held,* that testator at the time of making his will was fully competent to do so, although of advanced age, and in his last illness, and some of the contestant heirs-at-law and next of kin took very little, and others nothing, under the will.

5. SAME—UNDUE INFLUENCE.

Proponent, a lawyer, who, although a relative of decedent was not an heir or next of kin, and who had transacted some legal business for decedent, drew his will and was the principal beneficiary thereunder. *Held,* that the burden thereby thrown upon proponent of showing that the will correctly represented decedent's wishes was met by the fact that for more than a year previously the testator had the general scheme of the will, as drawn, in mind; that the drawing of the will originated with testator, and not with proponent, who merely, testator being dangerously ill, acted as scrivener when requested to do so by testator; that testator had previously consulted with his wife, and that testator was surrounded by friends during the entire time of the visit of proponent, so that latter had not the opportunity to unduly influence testator.

Probate of will of Solander Carver, deceased. Granted.

C. Z. Lincoln, for proponent and widow; T. H. Dowd and Alfred Spring, for contestants; J. J. Inman, special guardian, appeared in person.

DAVIE, S.—This is a proceeding to secure probate of the instrument propounded as the last will and testament of the deceased, such probate being opposed upon the grounds of alleged fraudulent alteration, undue influence, and lack of testamentary capacity.

Solander Carver died at the town of Great Valley, in the County of Cattaraugus, on the 14th day of February, 1893, at the age of 69 years, leaving him surviving his widow, Rebecca Carver, one sister, several nephews and nieces, but no children or lineal descendants, and possessed of real estate of the value of about $7,000, and personal property to the amount of $14,000. The instrument presented for probate herein bears date on the 9th day of February, 1893, and by its terms be-

queaths to the widow all of testator's household furnriture and an annuity of $400 during life. It gives to each of the sons and daughters of a deceased sister of testator small legacies in money; bequeathes to Viola A. Bailey, another niece, an interest in a certain real estate mortgage known as the "Niles mortgage;" and devises the real estate to the proponent, and gives to him the residuum of the estate after payment of such legacies and the death of the annuitant. The proponent and the legatee Bailey are children of the only living sister of deceased; the contestants William Scoby and Jennie Norton are children of a deceased sister of the testator; and the minors, who appear herein as contestants by their special guardian, are grandchildren of said deceased sister.

A methodical analysis of the objections urged against probate herein, and of the facts and circumstances upon which the same are predicated, leads us first to an examination of the claim of fraudulent alteration. Questions of this character have been before the courts so frequently that there need be but little difficulty in determining the general legal principles applicable thereto, and in passing it will be observed that more marked distinctions exist between alterations, erasures and interlineations appearing from inspection of wills than any other class of legal documents. As a general rule such alterations, in the absence of proof to the contrary, are presumed to have been made before the execution of the writing in which they appear. Such presumption seems to have had its origin in the fact that material alterations modifying or defeating vested rights under written documents are usually the outgrowth of a criminal intent, the existence of which the law does not willingly presume, always preferring the presumption of innocence to that of guilt; but an exception to such rule exists in case of wills, which from their very nature cannot become operative or vest any rights, and which are absolutely subject to the volition of the testator, to the time of his demise, and where the necessity for the presumption above referred to does not exist. The generally recognized rule is that, where alterations appear upon the face of a

testamentary disposition of property, such alterations are presumed to have been made after execution, rendering it necessary for those seeking to establish a will containing such apparent defects to overcome such presumption by proof, direct or inferential. Wetmore v. Carryl, 5 Redf. Sur. 544; Dyer v. Erving, 2 Dem. Sur. 160. The Court of Appeals, in a somewhat recent case bearing upon this subject, says that, "where an interlineation, fair on the face of the instrument, is entirely unexplained, we do not understand that there is any presumption that it was fraudulently made after execution" (Crossman v. Crossman, 95 N. Y. 145-152); but in that case the application of the principle there enunciated was limited to wills where the interlineation was fair upon its face; for the court says that, if there are any suspicious or doubtful circumstances growing out of the mode of alteration, the ink in which it was made, the fact that it was in favor of the party holding the instrument, and that it is not noted at the bottom, then these and all the other circumstances pertaining thereto become questions of fact for the consideration of the trial court in determining whether such alteration was made before or after execution.

The second point of variance between wills and other instruments containing alterations is the effect thereof upon the validity of the instrument containing them. It is the general rule that a material alteration in written documents, made after execution, for fraudulent purposes, vitiates the entire instrument. Such, however, is not ordinarily the case with wills. The effect of an unauthorized and unauthenticated erasure or interlineation in a will, made after execution, is to render the change thereby sought to be made inoperative, leaving the will to stand in form and effect as before such alteration was attempted. The reason for such a rule in case of wills is apparent. The statute has surrounded the execution of testamentary instruments with certain reasonable forms and ceremonies as a shield and protection against fraud and imposition, and the purpose of such precautionary measures might be entirely defeated if held applicable only to the original execution, leaving all subsequent alter-

ations and modifications, however important, to be made without such protection.

The first item of the will in this case is as follows:

"First. After all my lawful debts are paid and discharged, I give and bequeath unto my beloved wife, Rebecca Carver, out of the avails of my personal estate, the sum of four hundred dollars annually, to be paid to her on demand by executor during her life. I also bequeath to my said wife all of my household furniture, goods, books, pictures, organ, clothing, etc., to be accepted in lieu of dower."

It is asserted by the contestants that the words "to be accepted in lieu of dower" were inserted after the execution of the will. This allegation presents a question of considerable importance, and one worthy of careful consideration, for the legal effect of the words claimed to have been added is to very materially diminish the value of the widow's interest in the estate of the deceased. If it appears with reasonable certainty from an inspection of the instrument that such words were not written at the same time as the other portions of the will, then the presumption is that they were inserted after execution, because in this case the alteration does operate in favor of the party holding the instrument, and it becomes his duty to show sufficient facts to overcome such presumption. This will is written upon the usual printed blank with ruled lines, and all thereof except the signatures of the testator and attesting witnesses was in the handwriting of the proponent. The words, "clothing, etc., to be accepted in lieu of dower," are written upon and constitute one entire line in regular order,—no crowding of words or letters, and no alterations, erasures or interlineations, or other peculiarities observable from inspection, except that the letters in the words "to be accepted in lieu of dower" are somewhat heavier, and of a slightly darker shade, than the letters in most of the other portions of said instrument, but no darker and but little heavier than the word "fifth," at the beginning of the fifth item of said will, and neither darker nor heavier than the letter "S" in the name of the deceased at the beginning of the

will. It will be entirely apparent to any one who will carefully compare the words claimed to have been inserted with various other portions of the will that such words were written with the same ink, and that their apparent darker hue is occasioned simply by a freer flow from the pen, and consequently a greater accumulation of ink at that point. It is the experience of every scrivener that irregularities in the general appearance of written documents, a diversity in the form and shading of the letters, is not only possible, but of very frequent occurrence in writings by the same person, at the same time, and with the same pen and ink, and that such is especially liable to be the case where the scrivener writes from dictation, with his attention divided between the mental operation of comprehending and formulating the instructions of the person dictating and the physical operation of placing the same upon the paper. There are other significant suggestions in this connection. The attesting witness Colgrove had been for many years the family physician of the deceased; was present at the time of the execution of the will; not only signed it as a witness, but saw the testator sign it; and on that occasion examined the will with considerable care, so much so that he observed and recollected the blot over the S in the name of the deceased at the beginning of the will; and upon the trial he is shown the will, and asked to examine it, which he does, and is then questioned with considerable particularity regarding its appearance, and he testifies distinctly that he observes no changes or alterations therein. Then, again, the widow—who is the only one prejudiced to any extent by the words claimed to have been inserted—was present with the deceased while the will was being prepared, and knew the wishes and desires of deceased in regard to the disposition of his property, and who is in a situation to know, and does beyond any question or peradventure know, whether this instrument is in the same situation now as when executed by deceased—appears in this case not as a contestant, but, with the proponent, urging probate of said will in its present form. She is a woman of good judgment and fair ability,

and the suggestion is farcical that she would knowingly and quietly submit to the consummation of a fraudulent scheme perverting the testamentary wishes of her deceased husband, and depriving her of valuable property rights. The only reasonable inference to be drawn from the relations of the widow to this contest is that she distinctly knows and understands what the wishes of the deceased were in regard to the contents of his will, and that she respects such wish, and governs her conduct so as to effectuate the same. In view of all these facts, I have found as a fact in this case that the instrument presented for probate is in the same condition now as when signed and executed by the testator on the 9th of February, 1893.

The second proposition in this case is that of alleged lack of testamentary capacity. The law does not, of course, attempt to define any particular grade of mental ability or acumen necessary to qualify one to make a will. Wills are made by all classes of people, in every station of life, and under almost every conceivable set of circumstances; by persons of weak intellect, and by those of magnificent ability; sometimes in the midst of life and business prosperity, at other times in *extremis*, or while overwhelmed with adversity. Hence it is impossible to formulate any precise rules applicable to any particular case. The most that the courts have attempted to do was to dispose of each individual case as it arises, upon its own peculiar facts and circumstances, and in so doing establish certain very general propositions bearing upon this subject. It has been asserted that in law the only standard as to mental capacity in all who are not idiots or lunatics is found in the fact whether the testator was *compos mentis* or *non compos mentis,* as these terms are used in their fixed legal meaning; and if *compos mentis,* he can make any will, however complicated; and, if *non compos mentis,* he can make no will, however simple. Delafield v. Parish, 25 N. Y. 9. Again, it has been asserted as a general proposition that one capable of comprehending the condition of his property, and his relations to those who are the natural objects of his bounty, and able to collect and retain in his mind without

prompting the elements of his business, possesses testamentary capacity. Van Guysling v. Van Kuren, 35 N. Y. 70. And, further, that no presumption of lack of testamentary capacity springs from the fact that the terms of the will are harsh and unjust, and that the natural objects of testator's bounty get less under the will than in case of his death intestate. *In re* Tracy, 11 N. Y. St. Rep. 103. And that there is no presumption against the validity of a will because made by a person of advanced age; nor can incapacity to make a will be inferred from an enfeebled condition of body or mind. Horn v. Pullman, 72 N. Y. 269. In the light of these and various kindred authorities, an examination of the evidence in this case discloses but little to sustain, but very much to refute, the claim of want of capacity. The attesting witness Colgrove, who evidently testifies in this case without prejudice or bias, was a physician of many years' practice. He had been the family physician of the deceased for many years, covering the time of the sickness and death of testator's only child. He visited deceased daily during his last illness, closely watched the progress of his disease, conversed with him frequently, and from his long acquaintance with and personal attendance upon deceased was peculiarly well qualified to speak as to his mental condition at the time of the execution of this will. He declares under oath, positively and distinctly, that the testator was then possessed of sound mind and understanding. Nor does he give a mere formal, inconsiderate expression of opinion upon this subject, but he is subjected to more than a usually lengthy and rigid cross-examination without in the least discrediting his evidence, but, on the contrary, disclosing many facts and circumstances showing the correctness of his opinion. The other attesting witness, Davis, had been for a long time a neighbor and intimate acquaintance of the deceased, had had business transactions with him, nursed and cared for him in his last sickness, and had ample opportunity to observe any loss of memory or failing of mental capacity on his part; and he also distinctly testifies that at the time of the execution of this will deceased was of sound

and disposing mind and memory. The correctness of these con-
clusions find most satisfactory confirmation by a slight refer-
ence to the circumstances attending the execution of this will
as disclosed by the evidence. Deceased had been for many years
prior to his death somewhat actively engaged in business. He
was a hard-working, industrious man, strictly temperate, pos-
sessed of sound judgment and practical common sense, not in-
clined to be communicative in relation to his business affairs,
but, on the contrary, of a secretive disposition, and up to the
time of his last illness had been a man of unusually good health,
aside from occasional slight attacks of rheumatism and acute
inflammation of the bladder, and at no time had he been afflicted
with any physical or mental disorder tending in the least to im-
pairment of his mental faculties. His final sickness began on
the 7th day of February, 1893, and the instrument now pro-
pounded for probate was executed within two days thereafter,
and at no time prior to the execution of the same did his con-
duct or conversation indicate any incoherence, loss of memory,
or weakness of understanding. Although not talking freely,
what he did say was in all respects rational, consistent and in-
telligible. Directly before the preparation of the will he con-
versed with the physician regarding his condition; spoke of his
plans and intentions regarding the making of a will, and ex-
plained why he had delayed it to that time; asked the physician
if he could then draw a will for him; desired an opportunity
of discussing his business affairs with his wife, and did so, and,
after his interview with her, again talked with the physician,
and informed him that he was going to make a will, and that
his wife desired to be pensioned, as he expressed it, and re-
quested the physician to stay and witness his will when drawn;
selected his nurse, Mr. Davis, as the other attesting witness;
expressed his approval of the form of the will after it was pre-
pared by saying that it was as he wanted it, and signed it
plainly and distinctly, and thereupon declared it to be his last
will and testament, and again requested the witnesses to sign it.
In view of all these facts and circumstances, concerning which

there is no dispute in the testimony, the conclusion seems irresistible that the testator at the time of executing this will was in all respects fully competent so to do.

The remaining question is that of the charge of undue influence exercised upon deceased by the proponent at the time of the preparation of the will. Having determined that the testator at the time of the execution of this will was of sound mind, fully competent to transact business, capable of comprehending the extent of his property and his relations to those around him, it follows as a corollary thereto and a natural deduction therefrom that the making of the will in the form it now presents was the free, untrammeled act of the testator himself. The cases have quite clearly defined the grade and character of the influence which must be shown to have been exercised upon the testator to justify denying probate to a will. In order to avoid a will upon any such ground it must appear that the influence exercised amounted to a moral coercion, which restrained independent action and destroyed free agency, or which by importunity that could not be resisted constrained the testator to do that which was against his free will and desire, but which he was unable to refuse, or too weak to resist. It must not be the promptings of affection, the desire to gratify the wishes of another, the ties of attachment arising from consanguinity, or the memory of kind acts or friendly offices, but a coercion produced by importunity, or by a silent, resistless power which the strong will often exercises over the weak and infirm, and which could not be resisted, so that the motive was tantamount to force or fear. Society v. Loveridge, 70 N. Y. 387-394; Gardner v. Gardner, 34 N. Y. 155; Marx v. McGlynn, 88 N. Y. 357; Seguine v. Seguine, 4 Abb. Dec. 191; Dean v. Negley, 41 Pa. St. 312. The exercise of such undue influence must be proved, and, while it is not necessary, and ordinarily not possible, to establish it by direct proof, the circumstances relied upon as inferentially showing the same must be of such a character as to naturally lead to the conclusion that such influence had in fact been exerted. Brick v. Brick, 66 N. Y. 144. It is not sufficient to

show that a party benefited by a will had the motive and the opportunity to exert such influence.    There must be evidence that he did exert it.    Cudney v. Cudney, 68 N. Y. 149; *In re* Williams (Sup.), 19 N. Y. Supp. 778.    In this case the will was drawn by the proponent, who is named as a legatee therein and executor thereof, and this circumstance is urged with great earnestness by the contestants as proof of undue influence on the part of the proponent.    It is undoubtedly true that the law looks with a jealous eye upon the acts of one who, standing in a relation of trust or confidence, is instrumental to any extent in procuring a testamentary provision in his own favor; and, while such circumstance does not in and of itself invalidate the bequest, it does call for satisfactory explanation, and imposes upon him claiming under such provision the burden of showing that it was in all respects fair and honest.    The only relation which proponent sustained to the testator of a confidential character at the time of preparing the will was simply that of scrivener.    The proponent was an attorney, and at some former time had transacted some little legal business for the testator by way of drawing bonds, mortgages and other papers; but it does not appear that at the time the will was drawn the relation of attorney and client existed between testator and proponent to any extent.    If the emergency of the case would have permitted doing so, it would undoubtedly have displayed much better judgment and sense of propriety on part of proponent to have procured the assistance of another attorney in preparing this will; but the fact that he failed to do so does not invalidate the legacy to him.    It has been distinctly held that the fact that the draughtsman who drew the will takes a legacy under it is only a circumstance to be considered in connection with other circumstances indicative of fraud or undue influence.    Post v. Mason, 91 N. Y. 539; Coffin v. Coffin, 23 N. Y. 9.    It has also been held that where a will was drawn by the principal beneficiary under it, and the testator was able to read writing, and of sufficient capacity to transact business, and yet did not read it, it may be inferred from the circumstances that the testator

was acquainted with its contents. Nexsen v. Nexsen, 3 Abb. Dec. 360; *In re* Smith, 95 N. Y. 516. In the case last cited, it was held that the fact that the attorney of the deceased was the principal beneficiary under the will does not alone create a presumption that the testamentary gift was procured by fraud or undue influence, but that in a case where the testator was of advanced years, infirm mentally and physically, and made his attorney his principal beneficiary, contrary to previously expressed testamentary intentions, and where such attorney was the draughtsman of the will, and took an active part in procuring its execution, and that the testator acted without independent advice, the burden is imposed upon the attorney of showing that the will was the free and untrammeled expression of the testator's intentions.

So I think it may be said that the general principle adduced from these various authorities applicable to this case is that under the peculiar circumstances attending the making of this will, the burden was imposed upon the proponent of showing that the will, in its present form, correcly represents the wishes of the deceased; and it is urged on part of the contestants that the evidence bearing upon that question falls short of meeting this requirement, and that it fails to show that the testator was fully apprised of the contents of the will before executing it. This charge necessitates an examination somewhat carefully of the facts attending such execution. Deceased was taken sick February 9, 1893. His physician was called, and visited him at the hour of 4 P. M. of that day, and found him in bed, troubled with a recurrence of his former ailment—inflammation of the bladder—and with an inflammation of the lungs. The physician visited deceased on the following day (Wednesday), and discovered that the inflammation of the lungs was extending, and had assumed the form of pneumonia. He visited him again on Thursday—the day the will was drawn—about noon, examined him carefully, and concluded that his recovery was a matter of serious doubt. He then talked with the deceased about his condition, and informed him that he was very sick,

but expressed to him the hope that he would recover; and then suggested to him that, if his business affairs were not satisfactorily arranged, he should then attend to them. Deceased replied that he had been thinking for four years of making a will, but that he had supposed that if a man made his will he would die soon after, and that he had put it off; that he intended in the fall to buy a house and lot in the village of Salamanca, and move there, and then make his will, but that he wanted his will made then, and that there was no one present who could draw it unless the physician would do so, to which the physician replied that he could draw his will, but that Mr. Wheaton was in the adjoining room, and he could do it much better. Deceased said he had not thought of that, and asked the physician to stay and witness his will when drawn, and to tell his wife to come into the room, saying he wanted to talk over his business matters with her. This request was communicated to the wife, and she thereupon went into the room with the testator, and closed the door, and remained alone with him for about one hour, and at the end of that time came out of the room, and informed the physician that testator again desired to see him. The physician accordingly went into the room where testator was, and again talked with him about his condition, and testator said to him: "I want you to have Stanley (Mr. Wheaton) make my will. Rebecca says she wants to be 'pensioned,'" and was thereupon evidently about to inform the physician what disposition he designed to make of his estate, when the physician told him he did not want to know anything about how he wanted his will drawn, and thereupon testator requested that Mr. Wheaton and his wife, Rebecca, come into the room, which they did, and remained with him for about one hour and a half, during which time the will was drawn. At the end of that time Wheaton opened the door and called the physician and the other attesting witness into the room, and said to them in the immediate presence and hearing of testator that he had drawn his will, and that he had read it over to him, and then asked the testator if there was anything he wished to change, to which testator re-

plied that it was as he wanted it. Thereupon testator took the pen, signed the will, acknowledged it to be his last will and testament, and requested the witnesses to sign it, which they did in his presence, and in the presence of each other. When the witnesses were called into the room the deceased was reclining in bed at an angle of about 45 degrees, with the will in front of him upon a book, and with full and ample opportunity of examining its contents. The proponent resided at the town of Little Valley, about 15 miles distant from the residence of the testator, and after the physician's visit on Wednesday he communicated with Wheaton, who thereupon went to the residence of deceased, arriving at the hour of midnight, and stayed there until after the execution of the will, and substantially all the time to the death of the testator. At the time of Wheaton's arrival one Mr. Eider was in charge of the testator, nursing and taking care of him, and he testifies that when Wheaton came he spoke to the testator, asking him how he felt, but that nothing whatever was said between them upon the subject of a will or other business affairs, and that he remained with the testator continuously to the time of the arrival of Mr. Davis, the other nurse, in the morning. Davis testifies that he was constantly in charge of testator from the time he arrived there until the physician came, about noon; that he was not out of the room, except momentarily, for the purpose of doing errands or transacting other matters of business, and that at no time in his presence did Wheaton and testator have any conversation in reference to the making of a will. Moreover, it distinctly appears from the evidence that the testator had not only been contemplating the making of a will for a long time, but that he had determined upon a general scheme or plan for the distribution of his property; that such plan involved the giving to his wife of an annuity during her life, and the making of Wheaton his principal beneficiary. In the summer or fall of 1892, the deceased, in speaking of testamentary wishes, said to his wife, in the presence of Miss Finney, a domestic, that he was going to give his wife $400 a year and a house and lot in town if he had one. In November, 1891,

in speaking about his property matters to the witness Bailey, testator said that he was going to make a will, and was going to will the farm to Wheaton, and that Rebecca wanted $400 a year for her share; that she did not want to be bothered with the farm; and that he was going to give the Niles mortgage to Viola Bailey. Again, in November, 1892, he said to the same witness, Bailey, that he must make a will; that he was going to give the farm to Stanley, and that Rebecca had got to be paid $400 pension; and that the interest in the Niles mortgage he was going to give to Viola Bailey; that the Scobys had done something he did not like, and he would not give them any property. This I believe to be a full and fair statement of the general facts attending and leading up to the execution of the will in question, and the conclusions directly established thereby, or reasonably and naturally inferable therefrom, are these: First, that for more than a year prior to his death testator had entertained a general scheme for the disposition of his property, the leading features of which were to "pension" his wife, and make the proponent his principal beneficiary after so providing for her; second, that the will as presented is in substantial compliance with such scheme or design; third, that the proposition for making a will at the time this will was drawn did not originate with the proponent, but with the testator himself, after learning from his physician the serious nature of his illness; fourth, that the proponent did not volunteer his services as scrivener, but acted in that capacity only after having been requested by the testator so to do; fifth, that such will was not prepared until the testator and his wife had consulted together in relation thereto; sixth, that the widow was present during the time such will was being prepared, and knew the desires and wishes of deceased, and has full knowledge at the present time as to whether the will is now in the same form as when executed, and whether it correctly represents the testamentary desires of deceased; seventh, that deceased was surrounded by friends and attendants during the entire time that proponent was there, and that the opportunity

did not exist for the exercise of any undue influence by proponent. After having carefully examined the elaborate briefs presented by the contestants in this case, and the various authorities to which my attention has been called, I am of the opinion that the conclusions above formulated are irresistible, and, such being the case, it becomes my duty to admit the will to probate. A decree will be accordingly entered.

(Note as to alterations in wills:)

GENERAL OBSERVATION.—WHEN ALTERATIONS DEEMED TO BE MADE (a) BEFORE EXECUTION, (b) AFTER EXECUTION.— BURDEN OF PROOF.—NOTING OF INTERLINEATIONS.— WHERE PROBATE OF WHOLE INSTRUMENT REJECTED.

### GENERAL OBSERVATION.

The leading case upon this subject is Crossman v. Crossman, 95 N. Y. 145. In that case testator had executed his will in duplicate; one only of the instruments was presented for probate. In the other, there was an interlineation of the name of one of the executors which apparently had been left out in copying, and the interlineation was noted at the bottom of the instrument before the attestation clause, and it was *held* that there was no presumption that the interlineation was fraudulently made after execution, and further, that where an interlineation is fair upon its face, and it is entirely unexplained, there being no circumstances whatever to cast suspicion upon it, it would not be proper for any court to hold that the alteration was made after execution; but if there were any suspicious or doubtful circumstances growing out of the mode of the alteration, the ink in which it was made, the fact that it was in favor of the party holding the instrument, and that it is not noted at the bottom, then these and all the other circumstances must be submitted as questions of fact to be determined by the court, in deciding whether the alterations were made before execution or not.

### WHEN ALTERATIONS DEEMED TO BE MADE BEFORE EXECUTION.

A testator had two sons and three daughters, and by his will

he devised one-fifth of his estate to each of them successively, but in the clause making such provision for one of his daughters her name was interlined. The entire will, including the interlineation, was in testator's handwriting, the whole appearing to have been written at the same time, with the same pen and ink. There was no note of the interlineation in the instrument. *Held,* that as the interlineation was fair upon the face of the will, and rendered effective a part of his will containing only provision for one of his children, it was made before execution. (Matter of Voorhees, 13 St. Rep. 183, 6 Dem. 162.)

When a will is found carefully preserved among the testatrix's papers, and it appeared that her signature had been erased by drawing diagonal lines over the name and then nearly erasing such lines and the signature, and that the will now bore testatrix's genuine signature, carefully rewritten over the original signature, which was written with a different ink from that used in the body of the will or by the witnesses, *held,* that as the evidence showed that the testatrix might have used different ink from that used by the witnesses, and as the burden of proof was upon contestants to show that the erasure and subsequent signature were made subsequent to the execution of the will, the court could not (following the rule that when an interlineation or erasure is fair upon its face and entirely unexplained, there is no presumption in the absence of any suspicious circumstances that it was fraudulently made after the execution of the instrument) presume as matter of law that the erasure was made at some time subsequent to the execution of the will. (Matter of Wood, 32 St. Rep. 286, 2 Connoly, 144, 11 N. Y. Supp. 157.)

When the bottom of the first page of a will was cut off, but not so as to destroy its continuity, and the paper was folded in such a manner that neither of the subscribing witnesses could swear that the paper presented for probate had been mutilated or changed in any way since its execution, and it was found among decedent's private papers in its present condition, and it does not appear to have been disturbed until so found, there is no presumption that it was mutilated after execution. (Matter of Homes, 32 St. Rep. 902.)

When the testatrix was her own scrivener, and the custodian of the will, interlineations shown to be in her handwriting and erasures will be presumed to have been made by her prior to execution. (Matter of Potter, 33 St. Rep. 936, 12 N. Y. Supp. 105.)

The scheme of a will was to divide testator's estate into 100 parts; the persons who were to receive these shares appeared in the running writing of the will, but the *pro rata* of shares to be allotted to each of the beneficiaries was originally left blank. There appeared in the will, when offered for probate, pencil writing in some of the blanks superimposed over other pencil writings which had been either wholly or partially erased, and in other instances ink writings, different from the body of the instrument in the material employed, appeared over pencil writings wholly or partially obliterated. The contestants claimed that the burden rested on proponent to explain these erasures and obliterations, and satisfy the court by competent evidence that the will as it then appeared was in that condition when executed, otherwise the will should be recorded in blank. *Held,* that the rule relied on by contestants in regard to the presumption as to when interlineations or alterations of a suspicious nature appearing in a will were made, had no application to the case—that there is no statutory or legal requirement that a will shall be drawn on a particular kind of paper, nor with the same ink, nor exclusively in ink, nor all at one time; and there is no presumption that blank spaces left for the insertion of names or amounts in a will were filled in after execution; and *held* further, that the will should be admitted to probate and recorded, with the spaces filled in in lead pencil in blank, and as to the blank spaces which appeared filled in in ink, that same should be recorded as they appeared in the will, the difference in character of such writing, and of that in the body of the will, affording no ground for saying that such writing was inserted in the will after execution. (Matter of Tighe, 24 Misc. 459, 53 N. Y. Supp. [87 St. Rep.] 718.)

A handwriting expert testified that the first and second pages of a will were written on a half sheet of paper, larger and of a different milling from the rest of the will, and were in a running hand, which spread much more than the writing of the following pages, which was an engrossing backhand, changing to a running hand toward the last, and that the words "two thousand" in a clause giving an annuity of that amount in dollars to testatrix's granddaughter, were written over an erasure made with chemicals. *Held,* that these peculiarities rendered it incumbent upon proponents to satisfactorily explain same, and *held* further, that as the attorney who drew the will testified that he used a prior will as a draft in the preparation of

same, and the prior will with pencilled alterations therein, corresponded with the later will, the first and second pages of which were exactly similar to the former will, and as the attorney had no motive for altering the will after execution, it was exceedingly improbable that the will had been tampered with since its execution, and the peculiarities existing therein were sufficiently explained. (Matter of Dwyer, 29 Misc. 382.)

### WHEN ALTERATIONS DEEMED TO BE MADE AFTER EXECUTION.

After a will had been duly executed, certain alterations were attempted to be made by testator by writing in the will, erasing and interlining. *Held*, that the will as originally executed should be upheld. (Quinn v. Quinn, 1 T. & C. 437—citing Jackson v. Holloway, 7 Johns. 394, and McPherson v. Clark, 3 Brad. 92.)

To the same effect is matter of Prescott, 4 Redf. 178.

In Dyer v. Erving, 2 Dem. 160, it was held, following Wetmore v. Carryl, 5 Redf. 544, that in the absence of evidence to the contrary unattested alterations upon the face of a will must be presumed to have been made after its execution.

Material alterations in a will are not presumed to have been made before the execution thereof, where no explanation of the erasures is given, and where suspicion arises upon the face of the paper, and from surrounding circumstances, and it is doubtful if the erasures were made before the execution of the paper. (Herrick v. Malin, 22 Wend. 388; Smith v. McGowan, 3 Barb. 404; Acker v. Ledyard, 8 id. 514.)

After executing her will, testatrix stated to the scrivener she wished to make further bequests. Instead of preparing and having executed a codicil, the scrivener wrote testatrix's directions on a slip of paper, which he subsequently pasted upon the will, the latter having been cut into, so as to permit the clause to be inserted in its proper place as the seventh subdivision of the will. There was no republication of the will after that clause had been written. *Held*, that the will should be admitted to probate, excluding the inserted clause. (Stevens v. Stevens, 6 Dem. 262.)

An interlineation, erasure, or other alteration made in a will, either by the testator or a stranger, after due execution of the instrument, without a new attestation, does not avoid the instrument, but the court may disregard the same and probate the

will according to its original language, when that can be ascer-
tained. (Matter of Wilcox, 46 St. Rep. 877, 30 N. Y. Supp.
131—citing Doane v. Hadlock, 42 Maine, 72 ; Smith v. Fenner,
1 Gale [U. S. C. C.], 170 ; Will of Tonnele, 5 N. Y. L. O. 254 ;
Pringle v. McPherson, 2 Brevard [S. C.], 279 ; Stover v. Ken-
dall, 1 Coldw. [Tenn.] 557 ; Wheeler v. Bent, 7 Pick. 61 ;.
Penniman Will case, 20 Minn. 245 ; Wolf v. Bollinger, 62 Ill.
368 ; Locks v. James, 11 M. & W. 901 ; Short v. Smyth, 4
East, 418 ; *In re* Harny, 30 L. J. Prob. 142 ; Cooper v. Bockett,
4 Moore, P. C. 419 ; McPherson v. Clark, 3 Brad. 92 ; Matter
of Prescott, 4 Redf. 178 ; Wetmore v. Carryl, 5 id. 544-553 ;
Dyer v. Irving, 2 Dem. 160-183 ; Will of Wood, 32 St. Rep.
286 ; Quinn v. Quinn, 1 T. & C. 437 ; Lovell v. Quitman, 25
Hun, 537.)

### BURDEN OF PROOF.

Material alterations or erasures in a will are not presumed to·
have been made before the execution thereof where no explana-
tion of the erasures is given, and where suspicion arises upon the·
face of the paper and other surrounding circumstances, and it
is doubtful if the erasures were made before the execution of the
paper. In such case the propounder of the instrument must
make the doubt clear. (Matter of Barber, 72 St. Rep. 771.) ·

### NOTING OF INTERLINEATIONS, ETC.

Interlineations in a will need not be noted at the foot of the·
strument, provided that the place where it should appear is
made before the execution and publication of the will. (Matter
of Whitney, 70 St. Rep. 259, 90 Hun, 138—citing *In re*
Voorhees, 6 Dem. Sur. 162 ; Crossman v. Crossman, 95 N. Y.
145, 153 ; Tonnele v. Hall, 4 N. Y. 140.)

An interlineation may be made in a will, as in any other in-
strument, provided that the place where it should appear is
designated by the instrument with sufficient certainty. A will
was written on a blank form. The first and second clauses
filled up the blank space in the will, and at the end of such
space were the words, "See annexed sheet." The third and
fourth clauses were written on a separate sheet, fastened by
metal staples to the face of the will at a point near the end of
the second clause. *Held,* that the interlineation or attached
paper, by the terms of the instrument itself, was to come in and

be made a part of the will before the formal ending thereof. (Matter of Whitney, 70 St. Rep. 259.)

## WHEN PROBATE OF WHOLE INSTRUMENT REJECTED.

In doubtful cases, where material provisions in a will have been erased or altered, and the court cannot determine from the proof whether the alterations were made before or after execution, probate must be refused, and the whole instrument rejected.    (Matter of Barber, 72 St. Rep. 771.)