## In re DILLARD'S ESTATE.

No. 19779. Opinion Filed April 14, 1931.

Bass & Hardy, James H. Mathers, Green & Pruet, McLean, Scott & Sayers, Cham Jones, and Bleakmore & Barry, for contestants.

C. B. Stuart, Charles A. Coakley, D. M. Bridges, J. H. Harper, and Thomas Norman, for proponent.

KORNEGAY, J. This is a proceeding in error coming from the district court of Jefferson county, Honorable E. L. Richardson being the trial judge. It was a proceeding to admit to probate the last will of Josiah Hamilton Dillard. He died on the 30th day of September, 1927. He signed the will on the 24th day of September, 1927. He was 68 years old when he signed the will. Originally he came from Mississippi, and settled in the Indian country, and had done business near where he died for a great many years. He was a cattle man, and engaged in farming; he had oil interests and was a large real estate owner. He had been deputy sheriff of Carter county, was a man of high degree in Masonry, and had accumulated a very large fortune, consisting of lands, oil royalties, cattle and money in bank. He was a man of determination and strong will power.

He had raised two families, or rather had raised one and had started on another before his death. He had trouble with his first wife, and about 1922 she sued him for a divorce. In the divorce proceeding he gave her one-half of what they had at the time, mostly being deeded to her, partly to her adult children.

In the argument it was claimed by the attorney for the proponent of the will that the amounts given to the older children were voluntary, while the attorneys who opposed the will argued that the amounts given the older children were practically forced as a result of the divorce procedure.

He seems to have led a very active life, but in the last years of his life, though he still pursued his business closely, his health was breaking. He evidently came under the care of Dr. Von Keller, who treated him at the hospital for mercurial poison and Bright's disease, but he got out of the hospital as soon as possible and did not seem to pay much more attention to what Dr. Von Keller wanted him to do. However, he had a family physician, Dr. Boadway, who had been the family physician for about a year. He took sick at home. At that time he had two small children, one that was 20 months old at the time of the trial in this case, and one three and one-half years old, according to the testimony of the second wife.

He was moved to the hospital by his doctor in order that he might get better attention than he was able to get at home. A professional nurse, Eva Claiborne, was furnished him. He continued however, to transact more or less business after he went to the hospital.

He had a bookkeeper and office man, who had been in his employ for about six and one-half years. From time to time in the transaction of his business, the bookkeeper would come up to visit him, and make reports. He had been thinking of making a will for some time, and had been in consultation with an attorney, about 28 years of age, by the name of Thomas Norman. The father of this attorney had been his trusted friend and advisor years before. The testator had all confidence in the young man, and he selected him to be his attorney, and he had filled this station for some years.

Dr. Von Keller claimed that he had Bright's disease when he had treated him some time before. Dr. Boadway claimed that he did not have Bright's disease, but diagnosed his ailment early as being that of cancer of the liver with the stomach involved. Dr. Boadway attended him regularly twice a day while he was in the hospital.

The nurse kept a chart showing his physical condition, his temperature, pulse and respiration, and also showing when medicine was administered to him, and when food was given, and occasionally would write remarks on it as to whether the patient was resting well or not. He gradually grew weaker. On the 23rd of September, 1927, the doctor advised him that his case was hopeless.

The will that had been thought of and discussed and partly prepared was then prepared in full, after suggestions had been made by the testator as to its general outline and some minute details. It was prepared by his trusted attorney, and there is not much evidence that anybody else knew much about what was in the will, except the testator and his attorney. The second

wife seems to have been ignorant as to what was in it, though she was with the deceased at his bedside during his last sickness.

The witnesses to the will were the doctor who attended him, the bookkeeper who was his confidential man, and who had carried on business negotiations for him while he was in the hospital, and two other persons, one of whom was a vice president of a bank of which the testator was a customer and in which he held a large deposit, and the other was an employee of another bank of which the deceased was a customer and in which he had large deposits at the time of his death. The wife and an older son were present when the parties came to attest the will, and they were requested by the deceased to leave the room, which they did. The will was made in duplicate. When the bankers came to witness the will, they were spoken to by the testator, and were asked to act as witnesses to the will. He did the same thing to his family doctor.

The lawyer who prepared the will was the son of a life-long friend, and was one in whom the testator had implicit confidence. For quite a while they had offices next door to each other in the Norman building. One of the copies of the will was returned to the lawyer and taken to the office, the other was retained by the testator.

The chart kept by the nurse showed the state of the health of the deceased, and the progress of the disease, and when the period of exhaustion came. He died six days after the will was made, according to the chart. During the last two days he was very low, and finally on the last day the chart says he was "irrational."

The will on its face appears to be fair. It was executed with all the formalities prescribed by the statutes. It provided for every member of his family, not omitting the divorced wife. The statement, contained in the will, shows that he devised to her the allotment of a deceased son by her that the testator had inherited. Aside from his devise, the property was devised and bequeathed to his heirs, the two small children getting the best of it. However, there was devised to each of the older children fully 20 times as much land as there is per head for the people of the state of Oklahoma if the land were all divided proportionately, besides a large amount of personal property, so that each of the elder children received under this will far more than the average person can hope to obtain in a lifetime.

The will was offered for probate in the county court by Vida Dillard, who was named as executrix therein. It was attacked at once by the older children. The claim was made that the deceased did not have testamentary capacity, and that undue influence had been exercised; that the draftsman of the will, who was nominated by the testator to be the guardian of the minor children, would reap such a profit that the minor children should lose what the father had intended for them.

Just how the case was tried in county court we are not advised, and as to the evidence that was introduced, we are not advised, except what sifts through from the evidence, and the manner of its being introduced, in the district court. There were very able lawyers on both sides, and every technicality the law knows, appears to have been appealed to in the progress of the trial in the district court. However, the questions involved were simple. The will was not intricate.

As a matter of protection for his two babies, the deceased nominated a lawyer, 28 years of age, to be what is ordinarily known as a testamentary guardian. Under the law the testamentary guardian must give bond, and the county judge does not have to appoint him unless he is a fit and proper person. The mother could raise serious objections, if she desired, to the appointing of such a guardian. In the event the person so named succeeds in being named by the county court, he would have to give a bond to cover everything that he handled. In the event of mismanagement he was subject to removal by the county court, and on appeal, if the county court did not do right, the district court was there to clear it, and if the district court did not do right, this court is here to reverse, modify, and render judgments affecting the matter. Under these conditions the young man, who rejoiced over the confidence that had been placed in him by the testator, would be most carefully hedged about, if he should undertake to betray the trust that he hoped to get, provided the county court was willing.

Nothing appears in the conduct of the draftsman to indicate any overreaching. There was some intimation by the attorneys of the contestants in the progress of the case that Norman was too young to handle such a matter. However, the Constitution tells us that men of his age are eligible to the office of district judge, and men of 21 years of age to that of county judge. It also says that to be a member of this court a man does not have to be older than 30 years, and

we admit persons to practice law at the age of 21 years, and permit them to do as they will in their own matters as well as be the guide of others.

When we examine the surroundings of the testator and the testimony that was adduced at the trial in the district court, we find that the testimony to sustain this will is positive. It came from disinterested parties who were in a position to know, and did know, the mental condition of the deceased at the time of its making. They had been observers of the deceased, some for years, others for a short time, but all for a sufficient length of time to know full well his mental condition. They include his family doctor, and the nurse that had gone through with it, who had made a chart showing the steps in the progress of the disease that finally resulted in his death. Those charts were in evidence. They show clearly when coma came on. In addition to these there were business men who had observed other men in the line of work they were in for years, and thereby had gained a special knowledge as to the natural conditions of men, and of the testator himself.

The evidence on the other side was largely negative, consisting of the testimony of two doctors that saw him after the will was executed, and then only for a little while. Even one of them thought he could make a contract, though he could not make a will. The courts seem to think the other way, that a man sometimes has capacity to make a will who does not have the mental capacity to make a contract.

During the progress of the evidence, it developed that the testator was a little anxious as to what the older children would do with what he had given them, having observed, probably, what they did with what he had given them before, but he made up his mind to chance it, and it turns out that before this controversy had ended, in fact by the time it lodged here, over half of the beneficiaries of the will had transferred their entire interest in the estate to the divorced wife, and the others save one, had transferred theirs to Max Westheimer. The divorced wife is now carrying on. Max Westheimer wants to quit and take what is given them under the will.

We are called on to decide what should be done. In this matter the case turns on the mental capacity of the testator at the time of making the will. Two courts who saw and observed the witnesses and knew the parties have already decided that the mental capacity of the testator was sufficient to enable him to make a will, and thereby declare what he wanted to do with the remainder of his property. The will on its face appears to be fair. The testator was generous, but at the same time was careful to provide for the dependent little children, and to safeguard their interests as much as possible.

We cannot say that the evidence in this case points very strongly to mental incapacity of the deceased, in the light of the surroundings of the deceased, and of the opportunity of the witnesses to know and judge those things about which they were testifying. It is true that some of the contestants testified that he did not know them. Perhaps they thought so, perhaps the man wanted to rest. Naturally, suffering with the disease, and especially if it was cancer of the liver, the deceased would not be inclined to talk much. However, to his nurse and to his doctor, and to his lawyer, and to his bookkeeper, he would be inclined to say what he had to say.

Some objections are raised to the testimony of some of the witnesses, but we find nothing in these objections that would warrant us in setting aside the decision of these two courts.

The evidence, admitted without objections, was ample and conclusive enough to sustain the action of the district court. It is accordingly sustained, and this cause is remanded with directions to proceed with the administration according to the lines of distribution laid down in the will.

LESTER, C. J.; and RILEY, CULLISON, SWINDALL, and McNEILL, JJ., concur.

LUTTRELL, Special Judge, concurs.

HEFNER, J., disqualified.

CLARK, V. C. J., and ANDREWS, J., dissent.

---

ANDREWS, J. (dissenting). I am unable to concur with my associates in the opinion in this cause.

The syllabus in this case announces a new and novel rule of law. This court and other courts have many times held that the judgment of the district court based on the evidence in a will contest will not be reversed unless it is clearly against the weight of the evidence, or, as sometimes stated, against the clear weight of the evidence. In my investigation I have found no other case wherein it was announced that in a will contest the judgment of the Supreme Court would be affected in anywise by the judg-

ment of the county court, and I have found no other case announcing the rule that the Supreme Court "will not reverse the case unless the evidence is not sufficient to sustain the findings."

I cannot concur in an opinion that announces either rule. This court is supreme, under the provisions of the Constitution and as indicated by its name, and is not one of three courts, the judgment of any two of which shall govern. I am not willing that this court shall surrender its rights or disregard its duties in favor of any best two out of three rule, especially when the record before the county court is not brought to this court for review.

I am not willing to concur in an opinion in a will contest which is based in part on the high degrees of Masonry that had been conferred upon the alleged testator.

The opinion recites that there was devised to each of the older children "fully 20 times as much land as there is per head for the people of the state of Oklahoma if the land were all divided proportionately, besides a large amount of personal property, so that each of the elder children received under this will far more than the average person can hope to obtain in a lifetime."

I am not willing to concur in an opinion in a will contest that is based even in part on a communistic or Soviet theory of distribution of property. I am not willing to say, even by inference, that a person may be divested of his rights because he would receive more than the per capita share of land of a state and would have more than the average person could hope to obtain in a lifetime if his rights were granted to him.

The $100,000 life insurance payable to the two minor children, under a Soviet theory, would be ample for them, and to give them, under the terms of the instrument, in addition thereto, $150,000 with the oil royalties in the other property given them, in my opinion, leaves little room for the application of the Soviet theory to the facts in this case.

The opinion recites that the will was executed "with all the formalities prescribed by the statutes."

In the case of Schroeder v. Young, 161 U. S. 334, Mr. Justice Brown in delivering the opinion cites with approval from the case of Graffam v. Burgess, 117 U. S. 180, as follows:

"In reply to the argument that the proceedings were regular, Mr. Justice Bradley observed: 'It is insisted that the proceedings were all conducted according to the forms of law.' Very likely. Some of the most atrocious frauds were committed in that way. Indeed, the greater the fraud intended, the more particular the parties to it often are to proceed according to the strictest forms of law."

The opinion, according to its clear language, is based "on the mental capacity of the testator at the time of making the will." It is therein said that two courts saw and observed the witnesses and knew the parties and decided that the mental capacity of the testator was sufficient to enable him to make a will. It is said therein that the evidence of want of mental capacity should be disregarded for the reason that the deceased deliberately refused to recognize them because "he wanted to rest"; that, suffering as he was, he "would not be inclined to talk much"; neither of which conclusion is in anywise supported by the evidence.

The opinion recites:

"Some objections are raised to the testimony of some of the witnesses, but we find nothing in these objections that would warrant us in setting aside the decision of these two courts"

—a rather brief and terse disposition of an issue presented by the record in the cause and the briefs in the case. I am unable to determine how we have, or can have, before us a decision of two courts. It is my understanding that we have before us only the decision of the district court. That court had before it the evidence that that court saw fit to admit. The opinion in this case approved the judgment of that court on the evidence and, when it is contended that improper evidence is admitted and considered, this court tersely states, "We find nothing in these objections."

In the opinion it is said that "the testimony to sustain this will is positive. It came from disinterested parties who were in a position to know, and did know, the mental condition of the deceased at the time of its making." It is said that the evidence on the other side is largely negative.

Carl Holden, a deputy sheriff, and his wife, friends of Mr. Dillard, came up from Mineral Wells, Tex., to see Mr. Dillard on September 24, 1927. He had been in bad health and a physician had recommended a major operation. He reached the hospital, where Mr. Dillard was confined, about 3 or 4 o'clock in the afternoon. He saw Vida Dillard and the nurse and, in the presence of each of them, asked if he could see Mr. Dillard. The nurse, in the presence and hearing of

Vida Dillard, said no. He asked why, and she said, "No, you can't see him; he is bad off and probably won't know you."

That testimony came from Carl Holden and Carl Holden's wife, disinterested witnesses, but the court in the opinion in this case says that the evidence against testamentary capacity was "largely negative." I know of no way to procure any more positive testimony than that of friends who go to a hospital to see a man and are denied the privilege of seeing him for the reason that he would not know them if they did see him.

It will be noted that there is no authority cited in this opinion. An examination of the briefs discloses that both the contestants and the proponents cited in excess of 50 decisions of this and other courts. Those are brushed aside in the opinion as though they amounted to nothing.

The Honorable Charles B. Stuart and four other able lawyers, including Thomas Norman, the trustee under an express trust under the provisions of the will, disagreed with this court's conclusion and used many pages of their briefs in an effort to try to answer the contention of the contestants that Thomas Norman could not testify to communications had with the deceased during his lifetime. Many cases are cited on each side of this proposition. This court has seen fit to discuss none of those cases and to ignore them in so far as the opinion is concerned.

The only reference made in the opinion to the issues submitted by the record in this cause and the briefs is that the instrument offered for probate as a will is attacked on the theory that the testator did not have testamentary capacity, that undue influence had been exercised, and that the draftsman would reap a profit therefrom. Those were not all the issues submitted, and even those mentioned selected from the others are not discussed in the opinion further than to say that the draftsman was, under the terms of the instrument, made a testamentary guardian and, as such, had no interest in the estate.

In order for this instrument to be admitted to probate as a will, it was only necessary that the execution thereof be proven in accordance with the law. It was not necessary to show that Mr. Dillard knew what was in the instrument. He is presumed, under the law, to know what is in the instrument that he signed. However, the facts and circumstances accompanying the signing of this instrument were such that it was apparent to the attorneys for the proponents that this instrument could never be admitted to probate as a will without some testimony in addition to that of its execution. Therefore, Thomas Norman was put upon the witness stand to testify. Was he a competent witness? That was a question in the case. That question has not been decided. It may be that it has not been decided for the reason that to so say would be to announce a rule in conflict with that followed by the other states of this nation.

One of the major questions presented by this record is whether or not Thomas Norman, under the facts and circumstances shown by this record, should have been permitted to testify as to conversations with Mr. Dillard during his lifetime. I refuse to concur in an opinion in which that determining factor is ignored. With the testimony of Thomas Norman eliminated from this record, there is nothing to support the judgment of the district court under the rule established and followed in the other states of this nation. Mr. Dillard, an admittedly sick man upon whom the doctor pronounced the death sentence, whose friends had been excluded from the room because he probably would not know them if they saw him, was surrounded by grown sons, grown daughters, a brother and friends and relatives, and, from the entire group, only one witness, to wit, Thomas Norman, considered to be a beneficiary under the terms of this instrument, testified that Mr. Dillard ever saw the instrument prior to the time it was handed to him for his signature; that it was ever read to him at any time, or that he ever read it. Under the facts and circumstances shown by this record, the testimony of Thomas Norman is necessary to give any semblance of regularity to the proceedings in the execution of this instrument.

Notwithstanding the testimony of Thomas Norman, this record shows by admitted facts that the instrument was presented by Thomas Norman to Mr. Dillard on September 7th and that Mr. Dillard refused to sign it. On that date Mr. Dillard signed a letter and his signature was as follows:

It was presented to Mr. Dillard again on the 21st, again on the 22nd, again on the

morning of the 23rd, again on the morning of the 24th, and again about 3 o'clock on the afternoon of the 24th, and at each time Mr. Dillard refused to execute it. It was finally executed about 5 o'clock on the afternoon of the 24th, and the signature of Mr. Dillard thereto was as follows:

It appears to me that as long as the man had sufficient strength to deny the importunities of Thomas Norman he refused to sign this instrument. Thomas Norman explains those various refusals to sign by saying that Mr. Dillard wanted changes made. Then how can this court determine the validity of this instrument without determining whether or not Thomas Norman was a competent witness?

The opinion recites that the will was prepared after suggestions had been made by the testator as to its general outline and some minute details. That testimony came from Norman alone.

In view of the fact that the opinion discusses neither the law nor the facts shown by this record, I deem it of sufficient importance to set forth my views as to both.

The question of mental capacity to make a will is a question of fact and is to be determined from the condition of the testator's mind at the time of making the will. In re Estate of James, 131 Okla. 142, 268 Pac. 296.

Whether or not Mr. Dillard's vision was sufficiently good that he could see what he was signing, whether or not he knew the contents of the instrument he signed, and whether or not he was unduly influenced are questions of fact.

Those questions were before this court for consideration and determination. No one of them is determined by the opinion in this case. Mr. Dillard may have had mental capacity and the instrument offered fail by reason of the existence of one or more of those conditions.

A proceeding to admit a will to probate is in the nature of an equitable action, and on appeal this court will weigh the evidence to determine whether or not the judgment of the trial court is clearly against the weight of the evidence. Youngblood v. Rector, 126

Okla. 210, 259 Pac. 579, and cases therein cited.

The burden of proof in the trial of a contest of the probate of a will is first upon the proponents of the will to make a prima facie showing that the will is entitled to probate. In re Chubbee's Will, 133 Okla. 156, 271 Pac. 681, and cases therein cited.

The measure of proof required is dependent upon the peculiar facts and conditions and the relation of the parties.

Where the draftsman of a will is made a beneficiary thereunder, a strict rule is applied. If the interest given to him is small in proportion to the value of the whole estate and the decedent at the time of the making of the will is in possession of his health and faculties, slight proof will suffice, but, if the decedent is feeble in mind and the party drawing the will takes a considerable portion of the estate to the exclusion of heirs, proof of the most conclusive nature will be required. In re Appeal of Drake, 45 Conn. 9, and cases therein cited. In the body of that opinion the court said:

"A will written by a party benefited by it was void by the civil laws. At common law such a will is not void, but proof may be received to show that the paper is, in fact, the will of the decedent. The amount of proof required varies with the circumstances. If the interest is small in proportion to the whole estate, and the decedent at the time of making the will was in health, and in the possession of his faculties, slight proof will suffice. On the other hand, if his mind is feeble and the party drawing the will takes a considerable portion of the estate to the exclusion of heirs, proof of the most conclusive nature will be required."

The burden is on the proponent of a will, the draftsman of which is made a beneficiary thereunder, to show that the will represents the testator's wishes.

The proponent of a will prepared by a draftsman who occupies a confidential relation to the testator, such as attorney and client, and who receives a substantial benefit under the instrument, has the burden of overcoming the presumption of undue influence arising from the relation of the parties. Proof of the existence of such relation raises

a presumption of undue influence, and that presumption is fatal unless rebutted by proof of full deliberation by the testator and good faith on the part of the draftsman."

In re Carver's Will, 23. N. Y. Supp. 753, the court said:

"It is undoubtedly true that the law looks with a jealous eye upon the acts of one who, standing in a relation of trust or confidence, is instrumental to any extent in procuring a testamentary provision in his own favor; and, while such circumstance does not in and of itself invalidate the bequest, it does call for satisfactory explanation, and imposes upon him claiming under such provision the burden of showing that it was in all respects fair and honest."

In Johnston, Administrator, v. McCray, 122 Okla. 301, 254 Pac. 979, this court held:

"Where, upon proper pleadings, it is shown that a contract transferring property was obtained from a person of advanced years, enfeebled both in body and mind, by a person occupying a fiduciary relationship to the grantor, a presumption of fraud arises, and unless it is successfully rebutted by showing absolute fairness and good conscience in the transaction, and clear understanding thereof by the grantor, a court of equity will vacate and set aside such deed or contract, and adjudge the property described therein to be in the same legal status as if such contract had never been executed."

In the body of the opinion, this court said:

"It is unnecessary to cite cases on this equitable principle. In all, the burden is upon the defendant obtaining the advantage through such fiduciary relationship to vindicate the transaction."

In Hunter v. Battiest, 79 Okla. 248, 192 Pac. 575, this court held:

"Where one stands in the relationship of attorney to the testator at the time the will is made, and is also the principal beneficiary under the will, the fiduciary relationship being of the highest trust, the law indulges in the presumption that undue influence was used to procure the will, and the burden is on such beneficiary to show the contrary.

"The relationship of attorney and client begets the most unlimited confidence, and in a capital case, the fiduciary relation and the opportunity for undue influence are sufficient to cast suspicion upon a bequest made to the attorney by his client, and such bequest will be more readily set aside than in civil cases, or in criminal cases of a less serious nature.

"While mere suggestions or requests of disinterested parties to a testator would not constitute undue influence, the slightest suggestion of one bearing the confidential relation of attorney to a testator, especially where such attorney is the beneficiary under the will, might constitute undue influence."

"The law presumes that an attorney will stands in the confidential relation of attorney to another, if the attorney receives benefits during the existence of such relation, a presumption of law arises that the benefits were the result of undue influence; and in testamentary dispositions of property, the rule as to the legal presumption of undue influence is the same as in dispositions inter vivos, except that the attorney standing in confidential relation to the testator and receiving benefits under the will must be shown to have in some way actively participated in the preparation of the will or the disposition of the property.

"Where the legal presumption of undue influence has arisen by showing confidential relations in the disposition of property by will, the burden of proof is upon the party seeking to take the benefit of such disposition to rebut the presumption attached thereto, by showing that there has been either a severance of the confidential relations, that the party making the disposition had competent and independent advice in regard thereto, and was free from the influence of the attorney at the time the will was made.

"The law presumes that an attorney will so act and will so conduct himself as to leave not even a shadow of suspicion that he has done anything to place his personal interests in conflict with those of his client. If he has done so, and has thereby secured an advantage over his client, or a gift or devise from his client, the burden is doubly great of showing that such advantage, or such gift, or devise was not obtained through undue influence."

The language used in that decision, "and is also the principal beneficiary under the will," was applicable to the facts shown by the record in that case. There the proponent of the will was the sole beneficiary thereunder. That language was not intended to limit the application of the rule to cases where the draftsman of the will was the principal beneficiary under the will.

In Weston v. Teufel, 213 Ill. 291, 72 N. E. 908, it was said:

"Where a fiduciary relation exists between the testator and a devisee who receives a substantial benefit from the will, and where the testator is the dependent and the devisee the dominant party, and the testator therefore reposes trust and confidence in the devisee, as in the ordinary relation of attorney and client, and where the will is written, or its preparation procured, by that beneficiary, proof of these facts establishes prima facie the charge that the execution of the will was the result of undue influence exercised by that beneficiary, and this proof, standing alone and undisputed by other proof, entitles contestants to a verdict.

1 Woerner on American Law of Administration (2d Ed.) sec. 32; Richmond's Appeal, 59 Conn. 226, 22 Atl. 82, 21 Am. St. Rep. 85; Marx v. McGlynn, 88 N. Y. 357; Garvin's Adm'r v. Williams, 44 Mo. 465, 100 Am. Dec. 314; Coghill v. Kennedy, 119 Ala. 641, 24 South. 459; Thomas v. Whitney, 186 Ill. 225, 57 N. E. 808. This results from the distinction, pointed out in the authorities cited, between undue influence arising from coercion or active fraud and undue influence resulting from the abuse of a fiduciary relation existing between the parties. Proof of the relationship, and of the fact that the beneficiary, in whom trust and confidence were reposed by the testator, prepared or procured the preparation of the will by which he profits, may or may not be a preponderance of all the evidence on that subject. When that proof is made, the presumption arises therefrom that undue influence induced the execution of the document. That proof casts upon proponent, if he is to sustain the will, the necessity of showing that the execution of the will was the result of free deliberation on the part of the testator and of the deliberate exercise of his judgment. and not of imposition or wrong practiced by the trusted beneficiary. This, however, does not change the general rule, which is that upon the whole case the burden of proof is upon the contestants to establish the undue influence."

In Sewall v. McGovern (Wyo.) 211 Pac. 96, the court quoted with approval language as follows:

"'If a party writes or prepares a will under which he takes a benefit, that is a circumstance which ought generally to excite the suspicion of the court, and call upon it to be vigilant and jealous in examining the evidence in support of the instrument, in favor of which it ought not to pronounce unless the suspicion is removed, and it is judicially satisfied that the paper propounded does express the true will of the deceased'"

—and said:

"The same principle had been stated in almost the same language in the earlier decision of Baker v. Batt, 2 Moore, P. C. 317. The effect of this suspicious circumstance in the trial of an issue of undue influence has been discussed in this country in a multitude of cases which are cited in notes to Snodgrass v. Smith, 15 Ann. Cas. 551, and Kirby v. Sal'ards, 28 L. R. A. (N. S.) 270. Barry v. Butlin, 1 Curteis, 2 Moore P. C. 482. is universally recognized as the leading case. It is cited in almost every later decision, and, so far as we can find, has never been criticized or questioned. In applying the rule, cases seeking and probably attaining the same result afford examples of conflict in language arising largely from a different use of the terms 'presumption' and 'burden of proof.'"

In my opinion the rule is applicable whenever, under the terms of the will, a substantial benefit is given to the draftsman.

The proponents admit, by the citation of authorities, the correctness of the rule stated. The authorities they cite differ in the language used, and use "legacy," "a considerable portion of the estate," "writes himself the heir," "the essential benefit," "substantial legacy," "one-third of testatrix's estate," and so forth. I think that the rule stated is correct and that a substantial benefit given under the terms of the will is sufficient to invoke the rule.

The proponents contend that an executor, trustee, guardian for minor children, and the like are not beneficiaries under a will within the meaning of the rule of presumption of undue influence.

There is a marked distinction between an executor or trustee appointed by a will to carry out the terms of the will, to pay debts and legacies and to sell property devised for those purposes and for distribution of the estate, and those cases in which property is devised to a trustee to be handled by him over a long period of years, the trust property to be by him invested under limited directions, the income from the trust to be used for the benefit of the cestui qui trust and the trust estate to go in accordance with changing conditions as the conditions exist at a future date. In the latter class of cases the trustee has such an interest in the property as to bring into operation the rule of presumption of undue influence. The decisions differ in accordance with the terms of the trusts considered and the circumstances attendant upon the creation thereof.

Title Guaranty & Surety Co. v. Cowen, 71 Okla. 299, 177 Pac. 563, Wynona Oil Co. v. Barnes, 83 Okla. 248, 200 Pac. 981, and Ischomer v. Fryer, 105 Okla. 30, 231 Pac. 298, deal with executors, administrators, and guardians and not with trustees and are not applicable to the facts in this case.

The fact that a trustee is subject to the control of a court of equity, as held in Re Trustee of Vance, 102 Okla. 129, 227 Pac. 881, cited by proponents, does not affect the rule, for that is true as to all trustees.

The fact that the trustee may be financially interested only in the commissions, fees, or compensation to be received by him for his services as trustee does not change the rule, for that is the only financial interest any trustee has in a trust estate.

On or about the 7th day of September, 1927, Dr. Boadway was called to attend Mr. Dillard at his home. He found him "very

thin because he hadn't been out of the hospital very long then," and weighing about 135 pounds. He was "suffering considerable pain." Dr. Boadway prescribed for him until about the 11th day of September, 1927, when he had him removed in an ambulance to the Von Keller Sanitarium so that he could give him better attention. He was too sick to undertake to walk and was "a very sick man at that time." He saw him twice a day at the hospital up until the time of his death on September 30, 1927, prescribed for him and procured the services, at first, of one nurse and later of two nurses, to care for him.

When Dr. Boadway first examined him the doctor "supposed he had cancer of the stomach," and "inoperative cancer." After some four or five days at the hospital the doctor "began to feel like there was other involvements" and "thought possibly he had cancer of the liver" "involving the stomach."

Directly after the death of Mr. Dillard his abdomen was opened and Dr. Boadway found that his liver was distended four times the normal size; that "it encroached itself on the stomach and cut off the portion of the stomach so much it caused a constriction in the pyloric end of the stomach;" that "the immense size of the liver constantly pushing on the organ, practically closing it off just like you would push some blunt instrument against a rubber tube;" that "he was very toxic as in a cancerous condition;" and that "the liver was not functioning" and was "rotten."

Dr. Boadway did not look at his kidneys at the time of the post mortem examination and as an excuse therefor said "it was not necessary to look at them because the history did not indicate there was anything wrong with the kidneys."

Dr. Von Keller found the condition with reference to the liver substantially as stated by Dr. Boadway. He said: "The liver was one big mass going clear around his body and whenever you would touch it it would just fall to pieces and pus and nothing but pus would come." Dr. Von Keller found "the lower end of the stomach, which we call the pyloric orifice that was all swollen and thickened to a point with a cancerous mass and the outlet from the stomach to the intestines—that is the upper part of the intestines or the duodenum, that was very, very small;" the ordinary size of the opening would be about three quarters of an inch in diameter and the opening in his stomach was about the size of a lead pencil.

Dr. Maupin, one of the proponent's medical experts, testified:

"Q. You are up here as an expert now. Would a cancer of the liver that has been found on a man and that had rotted it so that it was falling to pieces, would that cause him pain? A. Yes, sir."

This witness also testified:

"Q. By the Court: From what you have read and from your experience is it your opinion that a man who has cancer of the liver or stomach, and that trouble alone, that he would remain conscious up until a short time before his death? A. Yes, sir. By the Court: How long a time would you say before his death? A. Well, sometimes— the last case I had that died in this condition was about six years ago. There was one or two up to twelve hours, and there was one eighteen. That is the longest. By the Court: Eighteen hours? A. Yes, sir. By the Court: If it was longer than that, Doctor, would you think there was some other disease in addition to it?' A. If it was longer than that. By the Court: You never read of it? A. No, sir."

All the testimony in this case shows that Mr. Dillard was in a coma at least from two to three days prior to his death.

The doctors disagree as to what caused the death. Dr. Boadway stated that it was due to cancer of the liver involving the stomach without any kidney trouble. Dr. Von Keller said that the death was due to cancer of the liver and stomach and Bright's disease. I do not consider it necessary to determine the cause of his death and have commented on this evidence only for the purpose of showing the physical condition of Mr. Dillard at the time of the signing of the instrument. All of the doctors agree that he was a "mighty sick man" at that time.

Mr. Dillard gradually grew weaker from the time he was taken to the hospital. About September 23rd, Dr. Boadway told Mr. Dillard's wife that "he was a dying man," the various members of the family were summoned to the bedside, the services of a specialist and an additional nurse were arranged for, and it was generally understood that Mr. Dillard could live at best only a few days.

On the morning of September 24, 1927, Dr. Boadway saw Mr. Dillard at the hospital sometime between eight and ten in the morning. He made an examination "only in a general way to see whether there was any change in his condition or not." He said that his mental condition was normal, not impaired in any way, and that there was nothing wrong with his mind except that he was weak. He said that on that morning Mr. Dillard asked him to witness his will sometime that afternoon and that he

saw him again in the evening when he came back to sign the will. He went into the the room in the afternoon and Mr. Dillard said to him, "I want you gentlemen to be witnesses to my will." Throughout his testimony he strenuously insisted that Mr. Dillard, at the time he signed the instrument, was mentally sound and knew what he was doing and that the sickness had not affected his mentality to the extent that he did not know just what he was doing. There are conflicts in the testimony of this witness and there are conflicts between the statements he made in the district court and those that he made in the county court. I do not consider it necessary to cite instances, and I have called attention to these conflicts only for the reason that the testimony of Dr. Boadway is directly in conflict with the testimony of Dr. Von Keller and Dr. White.

Dr. Von Keller saw Mr. Dillard on September 23rd and he examined a specimen of his urine and found "pus, blood, epithelial cells and casts" which to him indicated chronic kidney destruction or Bright's disease. That testimony is corroborated by the nurses' chart which shows that on September 24, 1927, at 8 o'clock in the morning, a specimen of urine was sent to the laboratory. The record, as shown by the chart from September 11 to September 30, 1927, shows no other instance of that having been done. It is strange that this man should have been in a hospital for that length of time and no urine analysis made. Dr. Boadway explained that by saying that the history did not indicate anything wrong with the kidneys. From the physical and microscopical examination made by Dr. Von Keller he pronounced the man to be suffering from Bright's disease and cancer of the stomach and liver, producing a condition of stupor and drowsiness from uremic poisoning. "He could be wakened and aroused, but just as soon as you would let him alone he would drop back again." Dr. Von Keller testified: "He says, 'Look at my stomach,' and while I was feeling of it he dropped off to sleep,— he dropped off into that somnolent condition." That testimony is corroborated by a number of witnesses, including the testimony of the dentist who treated Mr. Dillard's gums a number of times and who testified that he went to the hospital for the purpose of seeing Mr. Dillard on September 15th, 17th, and 21st and that he found gum boils in his mouth and gave him prophylactic treatment. In regard to the visit on the 21st, he testified:

"Q. Just state what happened on the 21st, —state what you said to Mr. Dillard and everything that happened in the room. A. I

talked with the nurse a little bit and we practically did nothing. Q. Why? A. To me it just appeared there wasn't any use of doing anything; that is the way it appeared, so I withdrew pretty soon. Q. What was his condition, Doctor,—did he speak to you on that date? A. No, sir. Q. How did he appear to you? Just describe his condition please to the court. A. Well, he just appeared to me that he was too sick for me to go there for that again and I just didn't do it. Q. Tell the court whether or not he appeared to be asleep or awake during the time you were there? A. I think he looked at me as well as I recall and I didn't say anything to him. Possibly I might have asked him how he felt or something, but I didn't get any reply. Q. Doctor, the times that you went to see him, I will ask you whether or not you got anything intelligent out of Mr. Dillard from what he said? A. He said something to me—I asked him how he felt as I remember, and he said something and I didn't know what it was and I asked the nurse what he said and it appears to me that was on the second visit and she said that he said he felt better, and that might have been on the visit I made out there. I didn't know what he said and I asked her what he said and she said he felt better. Q. What was the reason you couldn't tell what he said, Doctor? A. Just kind of muttered drawl; I didn't understand it. Q. Your hearing is good, is it not, Doctor? A. I think so. Q. How long had you known Foot Dillard? A. It must be 20 years. A long time. I don't recall."

Dr. Von Keller was vehement in his testimony that Mr. Dillard could not have been in the condition on the morning of September 24th in which Dr. Boadway says he found him. His testimony is corroborated by the testimony of Dr. White, the specialist who examined Mr. Dillard between seven and eight o'clock on the night of September 24th, 1927. They both stated that it would have been impossible for a man in his physical condition to have been able to carry in his mind the details necessary to make the will in question on September 24, 1927. They said that the disease with which Mr. Dillard was suffering was chronic and dated back a good many years and that it would have been impossible for a man in his condition to sufficiently rally to transact the business said to have been transacted on the 24th day of September, 1927. The trial court asked: "From what you saw of him on that date, do you think he could listen to an instrument the length of this will and listen to it being read and apprehend it all the way through as it was being read?" and he answered, "I don't think so, Judge, I am sure." Dr. White, the specialist, arrived shortly after the will was executed. He held a consultation with Dr. Boadway on that evening at 7:00 p. m., as shown by

the nurses' chart, and Dr. Boadway testified with reference thereto, as follows:

"Q. You saw Doctor White that night? A. Yes, sir. Q. And you went out there and both of you made an examination of Mr. Dillard? A. We did. Q. And Doctor, I will ask you whether or not Doctor White confirmed your diagnosis? A. He did. Q. And he agreed with you he was a dying man and there was no hope? A. Yes, sir. Q. And he agreed with you that the best thing you could do was to let him die as easily as possible and not worry him about anything? A. No agreement to it; there was nothing to be done; the case was hopeless. Q. It was hopeless, but make him as easy as possible during his last days? A. Yes; he didn't say that, but he understood. Q. About how long after the will was signed did you have that conversation with Doctor White? A. The same evening after the will was signed. Q. About how much time elapsed, if you recall? A. Somewhere around eight o'clock; I just don't remember the time."

It is contended that Dr. White, who examined Mr. Dillard at night between seven and eight o'clock, after the instrument had been signed between four and five o'clock in the afternoon, could not know much about the condition of Mr. Dillard at the time he signed the instrument, but it would seem that he would know as much about the condition of Mr. Dillard at the time he signed the instrument as Mr. Spradling and the other witnesses would know at 8:30 in the morning about Mr. Dillard's condition at 4:30 in the afternoon.

I do not consider it necessary to determine which medical testimony should be given the greatest credit and my remarks concerning the testimony of the doctors are only for the purpose of showing the background of the scene enacted in the room in the Von Keller hospital at about 4:30 o'clock in the afternoon of September 24, 1927.

The instrument in question covers ten pages of the typewritten record contained in the case-made. It provides for the disposition of several thousand acres of land in a large number of tracts to various persons; it names the widow as residuary legatee and as executrix without bond; it appoints Thomas Norman guardian of the estate of the two minor children; it directs that there be paid to Thomas Norman in trust for the use and benefit of the two minors the sum of $150,000 to be by him invested in bonds or other property; and it contains a provision that one-half of the producing oil royalty in four sections should be paid to the guardian, Thomas Norman, and applied in the same manner as the trust fund.

The contestants contend that Mr. Norman, under the terms of the instrument, would be a testamentary trustee, that certain portions of the estate would constitute a testamentary trust and that the title to that portion of the estate would pass to Mr. Norman as trustee, under the rule announced by this court in Hill v. Hill, 49 Okla. 424, 152 Pac. 1122.

In that case the property was devised to a trustee with directions to manage and control the same, to rent and collect the rents thereon and, at the expiration of the trust period, to convey the property to the children named, with the provision that in the event of the death of any of the heirs the part that should have fallen to those heirs should be distributed according to the directions in the will.

The will in question here, while it uses the word guardian in some places, can mean nothing other than trustee. It names, designates, and appoints Thomas Norman guardian of the estate of the two minor children and wills and directs that there be paid to said guardian, "in trust for the use and benefit of said minor sons," the sum of $150,000, "to be by him invested in bonds of the United States bearing interest or deposited in some safe and conservative bank or trust company at interest, or invested in such other first class interest bearing trust as may be for the best interest of said minors." It directs that the net profits, interest, and income from the fund shall be used as required for the maintenance and education of the two minors; that the principal shall be paid to the two minors in payments over a period of approximately 27 years; that, in the event either or both of the minors shall die before any or all of the payments have been made, the interest of the son or sons shall be inherited by their mother; that said payments shall be made to her "at the same time or times as would be made to said son or sons, had he or they lived;" and that, in the event of the death of the mother, the rights and interests bequeathed to her "in and to said fund shall revert to and become a part" of the general estate.

The proponents contend that the instrument was nothing more than the designation of Mr. Norman as guardian. Certainly Mr. Norman could not be guardian of the children after they reached their majority, and Mr. Norman could not be guardian of the children's mother after their death or of the estate after the death of the mother. By the terms of this instrument Mr. Norman is made trustee of a trust estate which he is to handle possibly until the two minors are 30 years of age.

He is directed to invest the trust funds

or deposit them in some bank or trust company at interest, the net profits, interest, and income to be used for the maintenance of the two minors. Each of the minors is to receive $25,000 when he is 21 years of age, each is to receive $25,000 when he is 25 years of age, and each is to receive one-half of the remainder when he is 30 years of age, provided that the minors are alive at those times. In the event that either or both of the minors shall die before any or all of the payments have been made, the interest of the minor or minors shall go to their mother at the same time or times as they would have been paid to the minors had they lived. In the event of the death of the mother of the minors, the fund shall revert to and become a part of the general estate.

The instrument gives, devises, and bequeaths to the two minors certain real estate. It wills and directs that there be paid to Thomas Norman in trust for the use and benefit of the minors the sum of $150,-000, and it gives, devises, and bequeaths to the minors the producing oil royalties, payments thereof to be made to the guardian and "applied in the same manner as the trust fund hereinabove provided for." The language used must be given some effect. Since the testator gave, devised, and bequeathed the land and gave, devised, and bequeathed the oil royalties to the minors and used different language with reference to the $150,000 trust fund, we must hold that the different language used was used for a purpose. This instrument clearly shows that the $150,000 was a trust fund. It was so designated in the paragraph dealing with the oil royalties and it was so stated in the paragraph dealing with the $150,000. That fund was willed to and, if this instrument is a will, it goes to Thomas Norman, in trust. Such was the construction in Hill v. Hill et al., supra.

I do not think it necessary to analyze all the cases cited and deem it sufficient to quote from 26 R. C. L. at page 1260, as follows:

"Whether the trustee takes a legal estate or not depends chiefly on the fact whether the testator has imposed upon the trustee any trust or duty the performance of which requires that the legal estate should be vested in him. (Morton v. Barrett, 22 Me. 257, 39 Am. Dec. 575, note 65 Am. Dec. 56.) A direction to pay the testator's debts, coupled with a devise to trustees, who were also named as executors, has been held to give them a legal estate in fee. So the trustee takes the legal title by implication where he is required to hold it for a long period in order to pay specific legacies, including annuities, to a large number of persons for life, and his duties require him to keep the estate, real and personal, so invested as to be not only safe but productive. (Hale v. Hale, 146 Ill. 227, 33 N. E. 858, 20 L. R. A. 247.) And the power to sell an estate in fee invests the trustee with the legal title in fee, even where the trust to sell is on a contingency. (Huckabee v. Billingsly, 16 Ala. 414, 50 Am. Dec. 183; Robinson v. Pierce, 118 Ala. 273, 24 So. 984, 72 A. S. R. 160, 45 L. R. A. 66.) When the express purpose is that the trustee shall have the management of the trust property, and shall receive and lay out the profits with his own hands at future periods, the trustee cannot be compelled to give up his legal estate to the cestui que trust. So, if the trust is not for a particular person only, but it is limited over for other persons, for whose protection the trustee's legal estate is necessary, or may be highly useful, it is plain that the duty of the trustee to those entitled in futuro requires him to retain his estate. (Battle v. Petway, 27 N. C. 576, 44 Am. Dec. 59.) The legal title to real estate and personalty remains in the trustee where it has been vested in him to be held for one person until marriage; afterwards for the joint use of husband and wife, and of the survivor, with contingent remainder over. (Potter v. Couch. 141 U. S. 296, 11 S. Ct. 1005, 35 L. Ed. 721; Rice v. Burnett, 1 Speers Eq. [S. C.] 579, 42 Am. Dec. 336; People's Loan, etc, Bank v. Garlington, 54 S. C. 413, 32 S. E. 513, 71 A. S. R. 800.)"

—and to refer to the decision of this court in Re Trusteeship of Vance, supra. In that case William Vance was a testamentary trustee for the use and benefit of Benjamin Vance, Jr. He was also guardian of Benjamin Vance, Jr., by appointment of the county court of Tulsa county. The administration of the trust estate was pending in the district court of Tulsa county and that court, in the trust case, made an order on the trustee for the payment of money. An appeal was taken from that order to this court and it was here contended that the district court had no jurisdiction for the reason that the administration of the estate of Benjamin Vance, Jr., a minor, was, under the Constitution, exclusively in the county court.

This court said:

"It would seem, therefore, the estate being in William Vance, trustee, that it in no sense comes within the previous constitutional provision, and the county court does not have jurisdiction of the trust estate. The will of Benjamin Vance is not set out in the record, but an excerpt therefrom is recited in the brief of defendant in error, which we assume is correct. The will recites that the trust continues during the minority of Benjamin Vance, Jr. The trust estate, therefore, should

be administered by the trustee under the supervision and control of the district court in equity in so far as all business pertaining to the estate is concerned. That is to say, the district court should pass upon all expenditures and receipts. The net profit shown by the estate, being the excess of income over expenditures, if any, as shown by the administration of the trust estate, is the property of the minor and is controlled by the constitutional provision above set out. Such net income, if any, should be paid by the trustee to the guardian of the minor. If the estate is not profitable, the district court in its discretion, no third person being interested, may order any part of the principal estate to be carved out of the trust estate and paid to the guardian for the maintenance of the minor, and any other proper expense allowed by the county court (26 R. C. L. 1327). When these sums come into the hands of the guardian, they should be reported by the guardian as the statutes provide, and the county court may allow or disallow all expenditures made in behalf of or on account of the minor, including all items similar to the one in litigation in this lawsuit.

"The county court also has jurisdiction in the guardianship case to make allowance for the maintenance of the minor, as well as all other matters peculiarly within the administration of the minor's estate, after the items in question have become such. This situation should continue until the minor reaches his majority, at which time the guardian may make his final report and deliver the estate to the heir, and the trustee may do likewise and deliver the trust estate to the beneficiary, the same person"

—and held that the title to the property in an express trust is in the trustee; that the trustee in the administration of the trust is subject to the control and supervision of a court of equity and not a probate court, and that the net income or profit of the trustee of an express trust, where the beneficiary is a minor, should be paid by the trustee to the guardian of the minor to be expended under the direction of the county court.

In that case the will creating the trust was not set out in the record, but an excerpt from it was set out in the brief of the defendant in error and the court assumed the excerpt to be correct.

That excerpt was as follows:

"I give and bequeath to my infant son, Benjamin Vance, Junior, all the rest, residue and remainder of my property of every kind and character, said property to be held in trust, however, by my father, William Vance, for the use and benefit of said son to be paid over and delivered over to him upon his attaining his majority, and should my son die without issue before the death of my parents, I will and bequeath to my parents the share and portion of my property which, hereunder, would have gone to my son, said property to be the joint property of my parents if both are living, but if one of them be dead, then to be wholly the property of the parent then living."

If that provision created a trust, certainly the provision in this instrument, as follows:

"I hereby name, designate and appoint Thos. Norman, of Ardmore, Okla., guardian of the estate of my two minor sons, James Huston Dillard and Jerry Hamilton Dillard and, in the event of his death or inability to serve, then Lute Jackson and J. H. Harper of Waurika, Okla., jointly; and I further will and direct that there be paid to said guardian, in trust for the use and benefit of said minor sons, the sum of one hundred fifty thousand dollars ($150,000), to be by him invested in bonds of the United States bearing interest, or deposited in some safe and conservative bank or trust company at interest, or invested in such other first-class interest-bearing trust as may be for the best interest of said minors; and all of the profits, interest, and income of said fund, as the same shall be received by said guardian, after deducting all expenses, commissions and disbursements, shall be used as required for the maintenance and education of said minors, payments to be made annually.

"The sum of twenty-five thousand dollars ($25,000) of said trust fund shall be paid to each of said minor sons when they, respectively, reach the age of twenty-one (21) years; an additional twenty-five thousand dollars ($25,000) shall be paid to each of them when they, respectively, reach the age of twenty-five (25) years; and one-half of the remainder shall be paid each on his thirtieth (30th) birthday.

"In the event either, or both, of said minor sons should die before any or all of the payments hereinabove directed have been made, the interest of said son or sons shall be inherited by their mother, the said Vida Dillard, and said payments shall be made to her, the said Vida Dillard, at the same time or times as would be made to said son, or sons, had he or they lived; and, in the event of the death of the said Vida Dillard, the rights and interest bequeathed to her in and to said fund shall revert to and become a part of my general estate"

—creates an active, testamentary trust.

The instrument under consideration in this case provides that the "profits, interest and income of said fund, as the same shall be received by said guardian, after deducting all expenses, commissions and disbursements, shall be used as required for the maintenance and education of said minors, payments, to be made annually." Since the trust con-

tinues after the majority of the minors, the expenses, commissions, and disbursements could not be authorized or approved by the county court as guardian, and the context clearly shows an intent to create an active trust with power in the trustee to incur expenses, to pay commissions, and to make disbursements.

I call attention to the fact that the difference in the language used in the three paragraphs dealing with the minors indicates an intention on the part of Mr. Dillard to create a different estate with reference to the $150,000 than is created with reference to the oil royalties and the land. The language used is highly technical, so much so that even the attorneys in this case disagree as to the meaning of it, and that fact alone is sufficient to show a reason for the application of the rule. It may be that had Mr. Dillard received disinterested advice he would have left the $150,000 in the same manner in which he left the oil royalties and the real estate, but he did not have disinterested advice. The advice he received was from an interested party. There is nothing in this record to indicate that Mr. Dillard knew anything whatever in regard to the terms and provisions of this instrument except, as Mr. Norman testified, that he told Mr. Dillard of the contents of the instrument or that he read parts of the instrument to Mr. Dillard.

It may be that that testimony was false. But, whether it is true or false, the fact that Mr. Norman was to receive, under the terms of the instrument, a substantial interest in the estate, gave Mr. Norman a motive for securing the execution of the instrument in the form in which it was prepared and that interest may have been the motive, not only for securing the execution of the instrument, but for the testimony of Mr. Norman, without which there is no testimony that Mr. Dillard knew the contents of the instrument.

This record shows that Mr. Norman, at and prior to the time of the execution of these instruments, held a position which brought him squarely within the rule announced in this case. Mr. Dillard had a considerable amount of life insurance payable to his wife as the guardian for their two minor children and for their use and benefit. On or about the 7th day of September, 1927, Mr. Dillard, at his home in Ardmore, in the presence of Mr. Norman and no one else, signed a letter directing the insurance company to change the appointment and designation of the guardian from his wife to Thomas Norman. That letter contained the following language: "to harmonize with the provisions of my will designating Thomas Norman as such guardian." No will had been executed designating Thomas Norman as such guardian. Mr. Norman says that Mr. Dillard kept that letter until about the 21st of September; that on the 21st of September it was given to him and that he kept it until the 23rd of September, on which date he dated the letter September 23, 1927, and mailed it to the insurance company. At the time that Mr. Norman mailed this letter to the insurance company there had been no will executed designating Mr. Norman as such guardian. It was doubtless apparent to Mr. Norman that, in order to make the change in the insurance beneficiary effective, a will must be executed containing a provision designating him as such guardian. On the 24th day of September, 1927, Mr. Norman was interested in the execution of the instruments prepared by him as a will, not only that he might be named as guardian and trustee in the will, but that he might become the guardian and trustee of the insurance fund. After Mr. Dillard executed and delivered that letter to Mr. Norman, Mr. Norman knew that he was to be the guardian of those children and there existed every possible reason for his trying to augment the estate that was to come to him. His actions with reference thereto are shown by the fact that thereafter, and on the 23rd day of September, 1927, Mr. Dillard changed the draft of the instrument that had theretofore been prepared so as to take away his wife's one-half of the oil royalty that he had theretofore arranged to give to her and to give that property to these two minor children, thereby increasing the amount of the estate that was to come to Mr. Norman as guardian and trustee to the amount of the value of one-half of the oil royalty. Mr. Norman testified:

"Q. Proceed. What did you do then? A. I went back to my office that afternoon and corrected these mistakes and returned out there to the hospital the following morning. I went in Mr. Dillard's room, gave him one copy of the will. I read from the other. and after reading it he said: 'There was one thing more that I wish to change. I wish you would write there a provision giving just half of my oil royalties to my wife, the other half equally divided between my two sons.' I believe that is the only change he made on that date. Q. What two sons? A. James Houston Dillard and Jerry Hamilton Dillard, the two babies. Q. By the last wife? A. Yes, sir."

Undoubtedly Thomas Norman had some interest in procuring the execution of the instrument creating the trust and naming him as sole trustee of the trust fund for

the use and benefit of those named in the instrument. It was he and he alone who prepared the instrument, he and he alone advised Mr. Dillard with reference thereto, and it was he who procured the signing of it by Mr. Dillard. His interest is shown, not only by the provision of the instrument itself, but by his actions and by statements made by him at or about the time of the signing of the instrument.

I am unable to understand why a man would name his wife sole executrix without bond and provide no restrictions upon the property given to her and in the same instrument convey more than $150,000 in property to a lawyer, inexperienced in handling property of any considerable value, to be held by him in trust for her two minor children, if he knew what he was doing. Of course, he could do that, but it would certainly be necessary for the lawyer named as trustee under those circumstances, who alone prepared the instrument, who alone advised with the maker in regard to the preparation of the instrument and who was active in procuring the signing of the same, to show that the maker of the instrument knew what he was doing at the time he signed it and that he was not unduly influenced.

On the day the instrument was signed Mr. Norman talked with the deputy county clerk of Carter county and said: "Mr. Dillard is dying; they are calling me to the hospital now. I have got to go. Will you finish making out this summons?" Mr. Saunders asked him, "Have you got his will and everything fixed up in good shape?" And Mr. Norman replied, "No, I haven't; not all of it." On the same day, between one and three o'clock in the afternoon, Mr. Norman, in a conversation with Mr. Robinson in the office of Mr. O'Dell, a justice of the peace in Ardmore, said, as testified to by Mr. Robinson:

"Q. I will ask you whether or not he stated to you that he was hard up and was having a dickens of a hard time and he was now in better position than he ever was and if things worked out right he would be fixed for life. A. In substance, that is what it was."

Mr. Norman admitted that "on or about the date of Mr. Dillard's death I made a somewhat similar statement." The trial court in commenting on that testimony said:

"I think we are going a long ways with this. I think any lawyer, even if it had been on Saturday, September 24th, even if he had known he was preparing the will for this man and was in the position of this young man, would have felt himself fortunate and it would have been natural for him to have made that statement and naturally a lawyer would have felt that way about it, especially a younger lawyer, and I know some older ones that would like to feel that way."

The statutory compensation for a guardian of two minors would be at least $8,000 per year. Section 4, chapter 84, Session Laws 1923-24. I cannot assume that the compensation as trustee would be less than that fixed by the law, for "equity follows the law." I will not herein determine whether compensation could be allowed by the county court in the guardianship matter and by a court of equity in the trust matter.

I am not willing to say that the possibility of obtaining compensation in that amount is not sufficient to excite the avarice of an individual to the extent that he would use his influence to procure the changing of the guardianship from Vida Dillard, wife, to Thomas Norman, attorney, and the execution of an instrument insuring an income of at least that amount for a long period of years.

I am inclined to agree with the trial court. I think it but natural for this young man who had already received an instrument changing the beneficiary of life insurance in the amount of $100,000 from Vida Dillard, guardian, to himself as guardian, and who, at that time, had in his possession a draft of an instrument prepared as a will which, upon execution, would validate the change in the insurance beneficiary and would also make him trustee of an additional sum of $150,000 and one-half of the producing oil royalties from four sections of land, to feel himself fortunate. Having that feeling, it may be that he would do everything necessary to procure the execution of the instrument that he had prepared. As a matter of law, under those circumstances, he is presumed to have used such of his influence as was necessary to procure, not only the execution of the intrument, but of the benefits to be derived by him from the execution thereof.

Mr. Norman was a lawyer of the age of 28 years. He had practiced law in Ardmore for seven years and, on his statement, had been representing Mr. Dillard regularly since the spring of 1925. On the morning of September 24, 1927, he went to the room of Mr. Dillard in the Von Keller hospital and found Mr. Dillard in bed. He said that he took out of his brief case two instruments and gave one copy to Mr. Dillard and read from the other copy.

"I read that corrected will to him, and at the conclusion of about the second paragraph or maybe the third paragraph of the will after I had finished reading the last devise and bequest to these adult children, Mr. Dillard made this statement: 'There are some horses out at the ranch that these children—these grown children, these boys' I believe he said, 'have shown preferences for; some of them I bought from them, and I want to leave them one or two horses more as a remembrance than anything else.' I told him to wait until I could get a pencil and piece of paper—pen and piece of paper—whatever I used—to write down the names of the boys and the description or names of the horses that he desired to leave, and when I obtained that I sat down on the bed and as he gave me the names of the children and the description of the horses I put it down. He only named five sons, five grown sons. I knew that he had six and in checking back I discovered that he left out Lee's name,—Lee H. Dillard, his grown son, one of the contestants. I called his attention to that fact and asked him is he desired to make a gift of a horse to Lee and then he replied: 'No, I didn't buy any of those horses from Lee and he has more horses now that he knows how to feed, and I won't leave him any.' I asked him if he thought of any other change, or had any other change that he desired to make, and he replied 'No,' that he thought that was satisfactory, and I left the hospital—I left the hospital room."

From this testimony it is clear that only the portions of the will described in that testimony were read to Mr. Dillard and that the provisions of the will with reference to the minor children and the bulk of the estate were not read to him.

There is nothing in this record to show that Mr. Dillard knew what that instrument contained other than the portions of it that were read to him by Mr. Norman. However, that is immaterial for the reason that that instrument was not the will of Mr. Dillard. He so stated, said that his will must contain provisions with reference to certain horses and directed that those provisions be inserted in the instrument.

Mr. Norman then went down town and procured the services of a stenographer to rewrite the instrument. She completed the work about 2:30 o'clock that afternoon. He then went to the bank and got a witness and went to the hospital about 3:00 or 3:30 in the afternoon. He left the witness that he took with him on the outside of the room in the hallway. He went into Mr. Dillard's room and he says that he read the instrument to him. "I read this will to him then. Mr. Gilstrap came in just a moment or two after I did." It appears from the record that Mr. Dillard and Mr. Norman were the only persons in the room at that time and the only thing in the record showing that this instrument was read to Mr. Dillard is the statement of Mr. Norman.

It is immaterial whether or not Mr. Norman read the instrument to him at that time, for the reason that that instrument was not the will of Mr. Dillard. He so stated and directed that another material provision be inserted in the instrument. He told Dr. Boadway, as testified to by the doctor, "'It won't be long; there is some changes I want to make.'" Mr. Norman again went to town and had the stenographer rewrite the last two pages of the instrument. Mr. Norman then returned to the hospital and on the road picked up another witness. He left that witness outside of the room and he and Mr. Gilstrap went into Mr. Dillard's room. From the record it appears that they and Mr. Dillard were the only persons in the room. Mr. Norman testified, "I told him then, 'I have this paragraph 9 of the will.' That is the only paragraph I read to him then." They then called the two witnesses and Dr. Boadway. Mr. Norman testified, "Mr. Dillard stated to all of them there, 'I have called you here to witness my last will and I want you to sign it as witnesses'."

From the record it appears that the only portion of the instrument signed by Mr. Dillard that was read to him at and immediately prior to the signing thereof by him and after the instrument had been finally prepared for signing by him was paragraph 9. The instrument signed by him was never read to him as a whole. Approximately the first three paragraphs were read to him in the morning. The instrument was then changed and read to him in the afternoon. The instrument was then changed again and paragraph 9 alone was read to him. Of necessity he must have remembered what was read to him in the afternoon if he knew what the instrument signed by him contained. The only testimony that the instrument in full was read to him in the afternoon is that of Mr. Norman and no witness was present at the time the instrument was said to have been read in full. This record shows that every time this instrument was read in full to Mr. Dillard he suggested changes therein and that each of those changes was for the purpose of giving to the contestants a greater portion of the estate. The question then presents itself, what, if any, changes would Mr. Dillard have directed to be made in the instrument had it been

read to him in full immediately prior to its being presented to him for his signature? Or, in the other words, did Mr. Dillard know the nature of the instrument signed, did he know what the instrument contained at the time he signed it, did it contain all of the provisions with reference to the disposition of his property that he, at the time of signing, wanted it to contain, and was he unduly influenced to make the instrument? Upon the answers to those questions depends the determination of the issues presented by this appeal.

The witnesses all agree that when the instrument was presented to Mr. Dillard for his signature he asked for his glasses. The record is silent as to glasses and as to the necessity of the use of them up to that time. The witnesses testified: "He said to get his glasses and they asked him where they were and he said in the dresser drawer, and they looked over there and were unable to find them and he told them to look in the bath room or bath room closet and look in his coat and see if they were not there, and they looked in there and didn't find them, and then Mr. Gilstrap supplied his glasses and he used those and I believe he requested a pen and he didn't find that and he used Mr. Norman's fountain pen." The glasses furnished him were broken. "One of the ear bobs was off." "I think one of the bows was broken off and somebody had to support it for him." "They were Kress glasses that belonged to Mr. Gilstrap." "I won't be sure, but I think it is the left temple piece that is broken and I think he caught it on the opposite side from the side that had the piece broken and held them on Mr. Dillard's nose this way (indicating)." "He complained of not being able to see very good through them, but I don't know just what he said about it. He said he couldn't see very good." If Mr. Dillard could not sign this instrument without glasses, it is evident that he could not read the instrument without glasses. Where were those glasses? Why were they not produced? Why was it necessary for those men to look for his glasses when his wife and the nurse could have been called to produce them? More important than those questions is, Did he know what he was signing? From the record it is clear that he knew only what Mr. Norman had told him.

The proponents produced as a witness an optometrist who testified that he last made glasses for Mr. Dillard in November, 1921; that the Gilstrap glasses shown him were "about half as strong as the ones that I made for Mr. Dillard at that time;" that

if a man had to wear glasses as strong as those he made for Mr. Dillard, objects would appear to him when he used the Gilstrap glasses as "blurred;" that Mr. Dillard's glasses on September 24, 1927, "would naturally have been a stronger glass;" that with glasses such as the Gilstrap glasses "it would make a blotch before Mr. Dillard's eye" and that he could not see "clearly."

There is no question, from the record, but that Mr. Dillard, when handed the instruments "folded up," took the word of Mr. Norman and that he signed them without any knowledge of their identity or of their contents other than the word of Mr. Norman.

The proponents rely on a statement from Redfield on Wills, as follows:

"We see no reason for requiring positive evidence of the will being read to a testator who is blind in the presence of the witness; since it has been decided that where a will is drawn up in the presence of the testator and signed by him, although not read to or by him, if properly executed and witnessed, it becomes a valid testament upon proof that it was, in fact, drawn up according to the testator's instructions."

That statement cannot apply to the facts in this case, for here the will was not "drawn up in the presence of the testator," but at the hour of two o'clock a. m., by Thomas Norman in the privacy of his office, and here the only "proof that it was in fact drawn up according to the testator's instructions" came from Mr. Norman, the draftsman, who was given a substantial interest in the property under the terms of the instrument.

The testimony of Flora Cummings, who typed the instrument on the afternoon of September 24th, is of no evidential value in determining whether or not Mr. Dillard knew what he was signing. She could testify, and did testify, only that the instruments offered in evidence were the instruments Mr. Norman told her to copy and that she did copy.

If Mr. Dillard could not remember from the time he last used his glasses what he did with them and if he could not remember whether they were in the dresser drawer or the bath room or the bath room closet or in his coat, how can it be said that he could remember well enough to dispose of this complex estate? How can it be said that he could remember from the time Mr. Norman read the instrument to him to the time he signed it what Mr. Norman said the instrument contained?

Mr. Norman, and Mr. Norman alone, says

186

that on September 22, 1927, he went to Mr. Dillard's room and read and discussed a draft of the will. He says that Mr. Dillard detected the misspelling of the name "Cerley" and requested that it be corrected to read "Kerley." I call attention to this only for the purpose of showing that there must have been a marked change in Mr. Dillard's mental condition from September 22nd to September 24th if he could detect that error on the 22nd and could not detect the erroneous spelling of his own name on the 24th.

The trial court found: "I think he had decided on making this will substantially in the shape in which it was finally executed; "but that question was not before that court for determination. The fact that he decided on September 21, 1927, to make a will in a certain "shape" does not indicate that an instrument made in that shape on September 24, 1927, is a legal will. His intent on September 21st does not control the construction to be given an act performed on September 24th. The question at issue is the effect of his act at between four and five o'clock in the afternoon of September 24, 1927. He might have intended to dispose of his property in a certain way by will and before actually having done so he might have lost that mental power necessary to do so.

In determining the mental status of a testator in a will contest case, the question to be determined is, Did the testator possess mental testamentary capacity at the time of the making of the will? In re Chubbee's Will, supra.

The prior or subsequent mental status has bearing only to the extent of helping to determine the mental status at the time of the execution of the instrument. In re Estate of James, 131 Okla. 142, 268 Pac. 296, and cases therein cited.

Among the high points in this case that tend to throw some light upon the facts and tend to explain the testimony of some of the witnesses, I call attention to the fact that two instruments were signed, four men signed them as witnesses and two instruments were offered in evidence. Of course, Mr. Norman, as a lawyer, is charged with the knowledge of the fact that it was only necessary for one instrument to be signed and that four witnesses were not necessary, and it would seem that even a doctor, unlearned in the law, ought to know that it was not necessary for two wills to be signed. It appears to me strange that this lawyer charged with knowledge of the law and this doctor charged with the care of his patient would permit these men to go into Mr. Dill-

ard's room in the hospital and transact business with him of the serious nature reflected by this record after the doctor had stated that Mr. Dillard was in a dying condition, after the relatives of Mr. Dillard had been summoned to the bedside, after the relatives had been excluded from the room because of his condition and after friends had been denied admission because "he is too low to be seen and very likely will not know or recognize them." It would seem strange that the doctor would stand at the bedside of his dying patient and physically support his emaciated and weakened body while another held a pair of broken Kress glasses borrowed from one of the bystanders without knowledge of their strength or application to the eyesight of the sick man, permit that suffering patient to make the physical exertion necessary to the signing of two instruments, when the signing of only one was necessary, and know that the name signed to the instruments was illegible and that the name of the writer was misspelled, without at least asking someone if the will had been read to the sick man or asking the sick man if he knew of the conditions of the instrument he was signing. Those actions can be explained on the theory expressed by the doctors that the man was going to die anyway and that there was nothing that could be done for him. The controlling thought seems to have been to procure the delayed execution of the instruments while the patient yet had physical power to make an unintelligible scrawl of a misspelled name.

Another high point worthy of consideration is the fact that Dr. Boadway, on the 7th day of September, 1927, found Mr. Dillard "suffering considerable pain" from an "inoperative cancer" that had, the 30th day of September, 1927, distended his liver "four times the normal size" and had caused it to become "rotten" or "one big mass going clear around his body and whenever you would touch it it would just fall to pieces and pus and nothing but pus would come." It is contended by contestants that that condition would produce intense pain and that the pain found by Dr. Boadway on the 7th of September would have continued until Mr. Dillard's death unless there had been some relief afforded him. Dr. Boadway testified that on the 24th day of September, 1927, his "liver was not functioning," but that that condition affected him only physically and not mentally. Dr. White and Dr. Von Keller testified that the diseased condition of his kidneys, known as Bright's disease, produced a condition the effect of which would be to relieve the pain caused by the cancer of the liver and stomach. Dr. Boadway

testified and the nurses' chart shows that on the 24th day of September nothing was given Mr. Dillard to relieve the pain. The contestants contend that the deadening effect of the result of the condition of the kidneys not only relieved the pain caused by the condition of the liver and stomach, but in so doing, caused a mental condition amounting to a coma or stupor.

The witnesses differ as to how long it took Mr. Dillard to sign those two instruments, the time varying according to the witnesses between 15 minutes and one hour. The testimony shows that they were signed sometime between 4:00 and 5:00 o'clock, and that immediately following the signing and before some of the witnesses had left the room, Mr. Dillard began to vomit and was vomiting when the witnesses went out of the room. The nurses' chart shows that at 4:45 p. m. he had a large emesis of brown fluid containing particles of food.

The trial court in its finding said:

"I think that as soon as that man executed that will he finally collapsed and gave up and felt like that was the last thing he could do, and I feel that he was in a worse condition when the doctor from Oklahoma City came in, by far, than he was at the time of the execution of the will. I have had personal experience like that."

Of course, the personal experience of the trial judge is not contained in the record, and for that reason we are not able to give extended consideration to that. An examination of the nurses' chart kept as a daily record while Mr. Dillard was in the hospital and a record of original entry is directly in conflict with that finding. That chart shows no greater change in the temperature, pulse, and respiration of Mr. Dillard during the day of the 24th than occurred during the day preceding and immediately succeeding the 24th. At 7:00 o'clock on the morning of September 25th that chart shows "good night;" at 7:00 o'clock p. m. on that day it shows, "resting well," and at 7:00 o'clock a. m. on the 26th it shows, "good night." There is absolutely nothing in this record to show any collapse following the signing of those two instruments.

While discussing the nurses' chart, I desire to state that that chart shows no such change in the temperature, pulse, or respiration of Mr. Dillard on the 24th day of September, 1927, as would indicate any mental strain on his part during that day.

Just before the instruments were signed, Mr. Dillard was lying on his back on the bed. The bed was raised up some. Dr.

Boadway stood at his side with his hand somewhere under the forearm or elbow of Mr. Dillard so that he would have a support for that arm and the doctor's right arm was at Mr. Dillard's back supporting him. Another witness stood on the other side of Mr. Dillard holding some broken Kress glasses to his eyes with one hand and helping to support him with the other. Mr. Norman held the folded instruments for signing. When the second instrument was signed the parties were in the same relative position, but the bed had been raised somewhat higher.

During the trial there was an effort made by the attorneys for the contestants to show that someone of the witnesses held Mr. Dillard's hand and guided it while the signatures were being made. Every witness denied that, and each one of the witnesses said that no one held Mr. Dillard's hand and that he made the signatures himself without any assistance other than being supported in the bed and by having his forearm or elbow supported for the reason that there was nothing on which to rest it.

This record shows the undisputed testimony of Mr. Snodgrass, one of Mr. Dillard's bankers and one of the witnesses to the instruments, as follows:

"Q. Did anybody spell his name for him? A. No, sir; I don't recall that. Q. Will you swear that nobody spelled his name for him? A. I will swear that I don't remember anybody spelling his name for him. Q. As a matter of fact he spelled his name wrong on the will, didn't he? A. He did on one of the copies. Q. Look at that will (handing instrument to witness). You can tell that. A. Yes; I can tell he did. Q. Spelled his name wrong? A. Spelled the Dillard name wrong on one of them. Q. Did he ask anybody while you were there how to spell his name? A. No, sir. Q. He didn't? A. No, sir. Q. Didn't ask anybody how to spell his name? A. No, sir. Q. You have had considerable business experience with Foot Dillard for a number of years? A. Yes, sir. Q. Never knew of him spelling his name wrong? A. No, sir."

The signatures are in evidence and speak for themselves. In neither of them is the name legible. In neither of them is the name spelled correctly. Without knowledge of the thing intended to be written the writing is unintelligible. When compared with the signature of Mr. Dillard on the letter written about September 7th, 1927, a marked physical and mental change is shown to have occurred in him. The firm, steady handwriting is gone and the correctly spelled name is missing. Can a man who is in

such mental condition that he can no longer correctly spell his name legally dispose by will of an extensive estate?

An examination of the signatures on the two instruments signed on the 24th day of September, 1927, and a comparison of those signatures with the admitted signature on the other instrument offered in evidence need go no further than the letter "H." A casual glance will disclose that the letter "H" in the signatures on the two instruments offered as a will in nowise conforms to the letter 'H" in the other signatures. The difference in that letter and the other differences in the signatures speak for themselves and it is not necessary for me to comment on them further than to quote the statement approved by this court in Re Creger's Estate, 135 Okla. 77, 274 Pac. 30, as follows:

"These characteristics and discrepancies in the handwriting and in the spelling set forth above are evidence that cannot be discredited. These have no interest in the ultimate outcome of this litigation. They cannot be said to be biased or prejudiced, or to be influenced by their relationship to the litigants. Nor has any attempt been made to show that they do not speak the truth. On their face they reveal the habits of life of the proponent, and of the deceased. Unconsciously they proclaim the solemn truth that M. Creger did not write the purported will—that he could not have done so without going contrary to the principles of his nature, and without a revolution in the habits of writing developed and fixed during a period of nearly 70 years. There can be but one conclusion—some other than he did it."

In Sewall v. McGovern, supra, the court called attention to the rule of construction to be applied where the preparation of the will was by a beneficiary thereunder, in the following language:

"The preparation of a will by a beneficiary, a suspicious circumstance only, insufficient in itself to render the will invalid, never stands entirely alone. There are always other circumstances, if nothing more than the provisions of the will itself, and usually there are many others, not the same in any two cases, which must all be weighed in the end by the trier of the fact, who must then say whether it satisfactorily appears that the will does express the intentions of the deceased.

"The trial of this issue, as was said in Miller's Estate, 31 Utah, 415, 88 Pac. 338, quoting from Mooney v. Olsen, 22 Kan. 69, opens a broad field of inquiry. The suspicion excited by the fact that the beneficiary drew the will gains strength when it appears that he is a stranger to the blood of the testatrix (Lyons v. Campbell, 88 Ala. 462, 7 South.

250; Richmond's Appeal, 59 Conn. 226, 22 Atl. 82, 21 Am. St. Rep. 85); that by the will he takes a large or unreasonable proportion of the estate (Drake's Appeal, 45 Conn. 9; Coffin v. Coffin, 23 N. Y. 9, 80 Am. Dec. 235); that he was the trusted or confidential agent or advisor of the deceased (Lyons v. Campbell, supra; Weston v. Teufel, 213 Ill. 291, 72 N. E. 908; Barkman v. Richards, 63 N. J. Eq. 211, 49 Atl. 831); that he was present and active at the execution of the will, and took the instrument into his possession (Howell v. Taylor, 50 N. J. Eq. 428, 26 Atl. 566; In re Will of Everett, 153 N. C. 83, 68 S. E. 924; Haman v. Preston, 186 Iowa, 1292, 173 N. W. 894); that the testatrix was of advanced age, impaired faculties, and feeble of mind and body (In re Elster's Will, 39 Misc. Rep. 63, 78 N. Y. Supp. 871; Boyd v. Boyd, 66 Pa. 283); that she was illiterate and forced to sign by mark (In re Elster's Will, and In re Will of Everett, supra); that she had no independent and disinterested advice with reference to making the will (In re Nutt's Estate, 181 Cal. 522, 185 Pac. 393; Smith's Will, 95 N. Y. 516); that only a short time intervened between the signing of the will and death (In re Elster's Will, supra; Irish v. Smith, 8 Serg. & R. [Pa.] 573, 11 Am. Dec. 648)."

Paraphrasing that statement, the suspicion excited by the fact that Mr. Norman, who had been named guardian in a letter directed to the insurance company charging the beneficiary of $100,000 insurance from the wife of the testator, the mother of the children, to himself, drew the instrument naming him as guardian and trustee of property in value in excess of $150,000 to be held in trust over a period of approximately 27 years and confirming his designation as guardian in the letter to the insurance company, gains strength when it appears that he is a stranger to the blood of the testator, that he has never had any experience in the handling of property of any considerable value, that he was the sole and only attorney for the testator, that he alone prepared the instrument, that he was present at and active in the signing thereof, that he prepared and had signed two copies, one of which he kept, that the testator was of advanced age, impaired faculties and feeble in body, if not in mind, that the testator had no independent and disinterested advice with reference to the making of the will, that, during the process of the making, the amount given to the guardian and trustee for the benefit of the minors was materially increased and that the testator's condition grew rapidly worse from the time of the signing of the instruments to his death a few days thereafter.

The characteristics in the handwriting of Mr. Dillard, as shown by the prior signature, and the discrepancies in the handwriting and in the spelling in the signature to the instrument offeied as a will, are evidence that cannot be discredited. These have no interest in the ultimate outcome of this litigation. They cannot be said to be biased or prejudiced, or to be influenced by their relationship to the litigants. On their face they reflect the habits of life of the deceased. The mistakes in the spelling of the name and the formation of the letters in the signatures to the instrument offered as a will proclaim the solemn truth that Mr. Dillard could not have made those signatures while in a normal state of mind without his going contrary to the principles of his nature and without a revolution in his habits of writing developed and fixed during his life of nearly 70 years.

There can be but one conclusion, and that is, when those instruments were presented to him for his signature his bodily pain and mental suffering caused by his diseased condition had so far affected his mentality as to make it impossible for him to remember not only how he had theretofore formed the letters necessary to the spelling of his name but how he had theretofore spelled his name.

That condition of mind, taken in connection with the fact that he was unable to read the instruments offered, by reason of his blurred vision resulting from the use of a pair of Kress glasses less than half the strength necessary to afford him his usual vision. taken in connection with the fact that the instrument was not read to him in full after it was finally prepared for his signature, and that he had no way of knowing what the instrument contained except the statement of the lawyer who prepared the instruments and who alone advised in the preparation, and taken in connection with the fact that the one who alone had advised in the preparation of the instrument, who, without assistance, had prepared the instrument and who was therein made a trustee of property in value in excess of $150,000 to be held over a period of approximately 27 years, was such that I cannot say that the instruments offered for probate reflected the will of Mr. Dillard.

From this record it appears to me that the judgment of the trial court admitting this will to probate is clearly beyond the weight of the evidence even though the evidence of Thomas Norman is considered. I think that he not only had such an interest as to disqualify him as a witness from testifying as to conversations had by him with the deceased during his lifetime, but that his statement, admitted by him to have been made, was such as to show his interest in the matter. Without his testimony there is no evidence to sustain the judgment.

I am unable to concur in an opinion approving the state of facts shown by the record in this case. To do so is to open the door to fraud of the highest character. While there may have been no fraud in this case, the record shows a state of facts under which fraud of the grossest character might have been perpetrated. I believe that in the consideration of wills the fact that opportunity for fraud, under the facts shown, exists, should be considered in determining whether or not the conduct shown by the record should have been approved.

For the reasons expressed, I dissent.